**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DANIEL CONSTRUCTION COMPANY, A DIVISION OF DANIEL INTERNATIONAL CORPORATION, Respondent.**

No. 83–1571.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1984.

Decided April 2, 1984.

Melvin Hutson, Robert T. Thompson, Jr., Greenville, S.C. (M. Lee Daniels, Thompson, Mann & Hutson, Greenville, S.C., on brief), for respondent.

Joseph A. Oertel, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for petitioner.

Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

The National Labor Relations Board (Board) applies for enforcement of its September 30, 1982, order requiring Daniel Construction Company (Daniel) (1) to reinstate eleven former employees who were discharged, suspended or refused employment because of their pro-union activities and (2) to take other affirmative steps to cease unlawful labor practices. Daniel, in its cross-petition opposing enforcement, argues that the Board failed to establish *prima facie* cases of unlawful discharge by substantial evidence. We grant the Board's application.

Daniel, a division of Daniel International Corporation, operates over two hundred construction and maintenance projects throughout the United States. The present controversy arises out of labor unrest at two such projects in southeastern North Carolina—the Hercofina Chemical Company complex in Wilmington (Hercofina) and the E.I. DuPont de Nemours chemical production plant in Cape Fear (DuPont). Daniel provides ongoing maintenance and construction services to the owners of these facilities, employing a combined work force of approximately nine hundred non-union workers. The two work sites are only fifteen miles apart, but they are managed and operated as separate entities by Daniel. All parties concede that at the critical time involved in this application economic factors required Daniel to lay off a number of employees at these two sites and at three other project sites in the area. The Board charges, however, that Daniel used these layoffs as an opportunity to rid itself of certain employees because of their pro-union activities.

The unfair labor practices at issue here began in early March 1980 with the disclosure by Daniel officials at Hercofina that some members of its work force were receiving higher wages than other highly-skilled mechanics. The disclosure prompted members of the work force to take collective action to rectify perceived inequities in the wage structure. Three spokesmen from this group—J.P. Stevens, Floyd Wescott and Larry McDowell—met with the Hercofina project superintendent to discuss ways of defusing the situation. They were told, bluntly, "if you don't like it [the wage differentials] you don't have to work here." The workers responded by striking the facility on March 12, 1980. Initially, worker enthusiasm for the job action was high, as nearly all of Daniel's Hercofina work force stayed away from the jobsite. When talks between management and worker representatives failed to produce results, however, support for the strike quickly dissipated. In response to a company ultimatum threatening to replace the strikers, employees ceased their around-the-clock picketing of the facility on March

16, 1980, the day before the company was to begin hiring replacements.

Meanwhile, the North Carolina State Building and Construction Trades Council, AFL–CIO, organized a rally in support of the workers at Hugh McRae Park in Wilmington on Sunday, March 16. Approximately 200 employees from various Daniel job sites attended, including two DuPont project supervisors, who apparently were curious about the strength of union support among their work force. An AFL–CIO representative at the rally urged the employees to stop the strike and begin organizing. He encouraged those present to sign the union authorization cards being circulated among the crowd as a first step in an organization drive.

The labor problems at Hercofina and the union rally at McRae Park received wide exposure in the local media. Several company officials admitted recognizing some of Daniel's employees from newspaper photographs and television film clips of the rally. Testimony also indicated that Daniel obtained a "blow-up" of a newspaper photograph of the crowd for the purposes of identifying those employees in attendance. Daniel obtained further information about the rally by interrogating several workers suspected of being present.

Soon after the McRae Park rally, Daniel began laying off employees at the Hercofina and DuPont projects. Eighty employees lost their jobs as a result of three separate reduction-of-force plans implemented by Daniel. The Board conceded that economic reasons necessitated the general layoff, but charged and later found that Daniel impermissibly used the otherwise legitimate layoffs as a "smokescreen" to retaliate against selected members of its work force displaying pro-union sympathies.

The Board also found Daniel guilty of a range of other unlawful labor practices, including (1) repeatedly threatening employees with reprisals and plant closures to dissuade union activities; (2) coercively soliciting employees to rescind their union authorization cards; and (3) taking photographs of employees engaged in lawful picketing for the purpose of identifying union adherents. Daniel does not contest the Board's findings on these obvious section 8(a)(1) violations, but strongly opposes enforcement of that part of the Board's order dealing with the eleven employees allegedly discharged or refused employment because of their union activities. The Board ordered various reinstatement and back pay remedies for these eleven workers after finding that anti-union animus was a motivating factor for their inclusion in the layoff plans. Daniel contends that the Board's evidence does not satisfy the *Wright Line* standard. *See Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). *See also NLRB v. Transportation Management Corp.*, —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving Board's *Wright Line* formulation).

## I

### A

■ The scope of our review, of course, is limited. If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first instance. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The starting point for our review, then, is the factual record upon which the Board based its decision concerning Daniel's motivation in discharging each of the eleven employees.

### DUPONT SITE EMPLOYEES

#### 1. James Piner and James Perdue

Piner and Perdue were longtime Daniel employees at the DuPont site, having worked there for over six years each. Piner previously worked at other Daniel jobsites beginning in the late 1960's, and was the only "small tool repairman" on Daniel's DuPont payroll. Perdue, who was one of

only 10 machinists at the site, operated the 48-inch drill press as one of his primary job responsibilities. At the time of his termination, Perdue had more seniority than any employee in the shop other than a welder and a foreman.

Piner and Perdue briefly attended the union rally at McRae Park. They both saw their supervisor, Ken Willetts, among the crowd and left the rally soon afterward. Piner was asked about his attendance at the rally three days later by the millwright superintendent. After admitting he was present, Piner was told that his and Perdue's names were on a list of workers designated for layoffs. He also was told that company officials had enlarged a photograph of the rally to identify those workers in attendance. The next day Piner again confronted the superintendent seeking an explanation for his layoff. The superintendent indicated that he and Perdue were two of the best workers on the job, but that the termination decision was beyond his control. Immediately after laying off Piner and Perdue, Daniel transferred two employees out of another department to assume their exact duties—a strong indication that a lack of work was not the motive behind the pair's discharge.

### 2. Ralph Wilson and Jacqueline Wilson

Ralph and Jacqueline Wilson were the only husband-wife team employed at the DuPont site. Ralph was a welder and pipe fitter, who had worked for Daniel thirteen out of the last sixteen years. Jacqueline, also a pipe welder, had worked for Daniel for six years before her termination, three and one-half years of which were spent at the DuPont site. They were both placed on permanent layoff only four days after they attended the McRae Park rally and signed union authorization cards.

On receiving notice of their layoffs, the Wilsons pressed company officials up and down the chain of decisionmaking for an explanation. They were told by several supervisors that the decision came from "above," and that their work had been as good or better than other less senior workers still on the job. The Wilsons persistently sought an explanation from Jacqueline's immediate supervisor, Marshall Smith. On April 7, approximately two weeks after the layoff was announced, Ralph telephoned Smith seeking a written statement attesting to his wife's good job performance. Smith reportedly told Ralph that he would not discuss the matter on the phone for fear of a possible "tap," but would meet the couple later that night at a nearby parking lot. At the arranged time, Smith appeared at the lot and crawled into the backseat of the Wilsons' car. While the Wilsons drove around town, Smith purportedly told them that Daniel had brought in a special team from its Greenville operations to lay the groundwork for the company's defense against unfair labor practice charges stemming from the DuPont and Hercofina unrest. He also revealed that the company ordered him to sign a prepared statement confirming the lack of work in his department prior to the layoff.

### 3. Heber Norris

Norris worked at the DuPont site for two years before his layoff on March 20. He was present at the McRae Park rally and signed a union authorization card. He also took other cards from AFL–CIO officials to distribute among his co-workers. It is not entirely clear, however, that company officials had direct knowledge of his card distributions. On the day of his layoff, Norris confronted various company officials with charges that he was being singled out because of his union activities. Jim Whitehead, shop foreman, told Norris that the decision had been made by Superintendent Wiggins. Whitehead also informed Norris that the superintendent refused his advice to lay off a less senior member of the work crew. Whitehead could not explain, however, why the superintendent had flatly rejected his recommendation. Nor could he satisfactorily explain why Norris was the only metal worker terminated when most of the others performing the same duties had significantly less experience.

## HERCOFINA LAYOFFS

### 1. Larry McDowell

McDowell worked at various Daniel projects for eight years before his layoff. He was one of only ten men at the Hercofina site capable of both welding and pipefitting. He also was the only welder fully qualified to handle titanium alloy, a task for which he received extra pay. His work was of sufficient quality to merit selection as Daniel's substitute foreman on at least ten occasions.

McDowell was "elected" as one of three spokesmen during the labor disturbances at Hercofina. He met with management on several occasions to present worker grievances and to offer suggestions for changing the wage structure. On returning to work after the strike ended, he was reprimanded by company officials for soliciting union authorization cards from co-workers.[1] Four weeks after the strike incident, McDowell was the only man on his eighteen-person crew to be terminated, even though many of his co-workers were less skilled and less senior.

### 2. Samuel Wood

Wood had been a highly experienced crane operator at the Hercofina facility for twelve years. His length of employment made him the third most senior workman on the whole project, and by far the most experienced of the four other crane operators on his crew.

Wood was a visible figure in the labor disturbances at Hercofina. He took his turn on the picket line during the March strike and was one of the last holdouts when the job action crumbled. He also attended the McRae Park rally and signed a union authorization card. Four weeks later, he was the only crane operator terminated even though he had double the job seniority of all his co-operators and thirty-six times the seniority of one of the recent hirees on his crew. On the day of his layoff, Wood was offered another job on a Daniel project if he would be willing to uproot his family and move to Bangor, Maine or Canton, Ohio.

### 3. Jerry Carter

Carter, a welder, worked at the Hercofina project for the better part of eight years. He participated in the walkout and picketing in March, and signed a union authorization card at the McRae Park rally. On his return to work after the strike, Carter had a heated encounter with management concerning his union activities. He received a written reprimand and a stern verbal warning to cease union solicitation at the worksite. Carter continued performing his job satisfactorily for the next two months.

Carter was terminated on June 27, 1980, only a few weeks before a Board-supervised election was to be held at Hercofina to determine whether the workers would be represented by a union. Pressed for an explanation, company officials indicated that Carter was selected for layoff because he created conflicts among his co-workers. He, nevertheless, immediately was offered another job if he would relocate to Virginia. He declined, but eventually was re-hired by Daniel at another jobsite in the North Carolina area after the Hercofina workers voted down the union by a substantial margin.

### 4. Donald Rouse

Rouse, a pipe welder, had been employed at Hercofina at various times since the 1960's. He was one of the most senior members of his work classification, even if only his most recent period of continuous employment is used to determine seniority. Rouse, like Samuel Wood, was a visible figure during the walkout in March. He manned the picket lines on three separate occasions and attended the rally at McRae Park. He did not, however, sign a union authorization card.

---

**1.** Daniel has not challenged the Board's finding that his reprimand constituted a section 8(a)(1) violation.

Rouse was terminated on June 27, 1980, only weeks before the representation election. He pressed officials for an explanation, but was told simply that his name was included on a layoff list. He was mystified by the decision because he had received significant praise from company officials as recently as a few months before the layoff. At least five persons with less seniority in Rouse's job category were retained and one of these had even "cussed-out" a foreman after having been on the job for only a few months.

### 5. James Stokes

Stokes, an ironworker, was suspended for two days immediately after the March strike. He and a co-worker were later terminated during the June 27, 1980 layoffs. The Board found that the layoff was for non-discriminatory reasons, but that the suspension constituted a section 8(a)(1) violation. The parties do not contest the correctness of the Board's decision with respect to Stokes's layoff, leaving the propriety of the two-day suspension as the only issue in dispute.

Stokes was a journeyman ironworker who had been employed at Hercofina for only six months when the March walkout occurred. He supported his co-workers and manned the picket line each morning of the strike. He also attended the McRae Park rally, but apparently did not sign an authorization card.

After learning that the company intended to hire replacements for any employees not back on the job by Monday, March 17, Stokes told his supervisor, in a telephone conversation, that he would return to Hercofina on the appointed date. On the morning of March 17, however, Stokes learned that his wife, who had given birth several days before, was to be released from the hospital and would need his assistance to return home. He called a co-worker to tell him that he would be late for work, and asked him to make the supervisor aware of the reasons for his delay. Stokes's wife also called the worksite to explain that her husband would be late because he was needed at the hospital.

When Stokes appeared at the worksite around noon, he explained the reasons for his tardiness to the supervisor. He was told he would need a "doctor's excuse" in order to return to work. He presented that excuse a day later and was allowed to return the following morning. The Board found that Daniel's delay in placing Stokes back on the payroll impinged on his recognized right to return to work after unconditionally abandoning an economic strike before replacements are hired. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The Board based its ruling on the fact that the "doctor's excuse" rule was never enforced before the strike and that its invocation in Stokes's case was motivated by anti-union sentiments.

### 6. Charles Boyd

Boyd, a co-worker of Stokes, was an ironworker with over fourteen years' experience. He was active in the labor unrest at Hercofina, having picketed during the strike, attended the McRae Park rally and expressed his support for a union by signing an authorization card. On June 27, 1980, he was terminated by Hercofina. Four weeks later he applied for another ironworker's position at Daniel's DuPont site. He completed the necessary application form and appeared at the hiring gate on the morning of July 23, 1980. Eleven ironworkers were employed that morning, but Boyd was not among them. At least one of the hirees had less than one-third of the experience of Boyd, and was not even present to hear his name called. The Board found that Daniel's refusal to hire Boyd was a section 8(a)(3) violation after the company failed to offer any rebuttal explanation for the action taken.

### B

Daniel's principal contention before this court is that the above-described factual evidence was insufficient under the Board's *Wright Line* test to establish *prima facie*

cases of unfair labor practices. It maintains that the eleven employees involved in this application for enforcement were terminated or refused employment solely because of economic factors.

■ In *Wright Line, supra,* the Board established its current proof requirements for determining whether an employer, acting out of "mixed motives," has violated the National Labor Relations Act (NLRA) by discharging or refusing to hire a union adherent. The *Wright Line* formula, which is patterned after the Supreme Court's *Mount Healthy*[2] decision, places the initial burden of persuasion squarely on the Board's general counsel. He must demonstrate by preponderant evidence (1) that the employee was engaged in protected activity; (2) that the employer was aware of the activity; and (3) that the activity or the worker's union affiliations was a substantial or motivating reason for the employer's action. Once it proves these three elements, the general counsel has established a *prima facie* case of unlawful discharge. The burden then shifts to the employer to prove affirmatively that the same decision would have been taken even in the absence of the employee's union sympathies. Normally, the employer, in this phase of the case, attempts to justify the discharge decision by pointing out the worker's deficiencies or the imperatives of an economic crisis. Success in this phase permits the employer to escape liability even if anti-union animus played some part in its decision. *See NLRB v. Transportation Management Corp., supra.*

Daniel's argument that the government was unsuccessful in proving *prima facie* cases of unlawful motivation is hampered by its own failure to contest its many section 8(a)(1) violations stemming from the same time period. Those violations provide independent evidence of Daniel's considerable and persistent hostility towards its employees' unionization efforts. Some of the more egregious uncontested charges include interrogating workers about their union affiliations, threatening a shutdown if the union gained a foothold at the facilities and promising reprisals, in selected cases, against workers found soliciting for the union on company property.

■ The pattern of individual mistreatment becomes even more apparent when the specific circumstances of each worker's discharge are analyzed. Without exception, each of the eleven employees displayed strong and visible support for unionization during a period of strained relations with management. In every case, the worker's leanings were known to the company, as a result either of its own investigation or the worker's admission. Furthermore, in each instance, the terminated employee was a worker of greater skill and value than his or her retained counterparts as judged by the employer's own criteria.[3] Viewed realistically, the specific circumstances surrounding each worker's discharge, together with the company's widespread unfair labor practices during the same time frame, provided a substantial factual basis for the Board's conclusion that Daniel exploited worsening economic conditions to rid itself of union supporters.[4]

---

**2.** *See Mt. Healthy City School Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

**3.** The ALJ found that Daniel had no specific employment policy regarding job seniority, but made extensive findings concerning each terminated employee's relative term of service to the company. In every instance, the terminated employee had more years of service with the company than his or her non-terminated co-workers.

**4.** Daniel argues that the Board, in arriving at its findings on the company's motivation, failed to

consider evidence that it had offered some of the employees jobs at other sites. Citing an unpublished opinion of this court, *B.E. & K., Inc. v. NLRB,* No. 80–1130 (October 20, 1981), Daniel asserts that such evidence casts "serious doubt on the substantiality of any findings of discriminatory motivation." We initially note that reliance on unpublished dispositions is generally disfavored. 4th Cir.R. 18(d)(ii). More to the point, however, Daniel's underlying premise is mistaken: the Board did consider evidence showing that the company had made some of the laid-off workers job offers at other facilities. In fact, the ALJ's 100-page opinion, which was adopted with minor clarifications by the Board,

At a minimum, the weight of evidence was sufficient to establish that anti-union animus was a motivating or substantial factor in the layoff decisions, which is all that *Wright Line* requires. *See NLRB v. Transportation Management Corp.*, supra.

## II

Daniel next contends that, even if its actions violated the National Labor Relations Act, the Board's back pay award should not be enforced because the assessed interest rates were excessive. It points out that the Board's present formula for calculating back pay interest, established in *Florida Steel Corp.*, 231 NLRB 651 (1977), is keyed to the Internal Revenue Service's "adjusted prime rate" rather than more reliable indicators of earnings potential, such as passbook savings or Treasury note rates. It contends that the present formula results in a windfall to the employee, because he receives almost twenty percent interest on his back pay award at a time when he could not hope to earn that much if he actually had the money in hand during the pendency of the Board's proceedings.

We are foreclosed from reaching this issue, however, because Daniel failed to present it to the Board. 29 U.S.C. § 160(e). *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982). Section 10(e) of the NLRA states that a party's failure to urge an objection before the Board precludes appellate consideration, unless the omission is excusable "because of extraordinary circumstances." *Id.* Daniel attempts to avoid the effects of this provision by arguing that its general exception to "each and every part of the remedy recommended by the administrative law judge" sufficiently presented its interest rate challenge to the Board. We, however, find no merit in its position. The Board's rules clearly identify the requisites of a valid exception:

(b) Each exception (1) shall set forth specifically the questions of procedure, fact, law, or policy to which exceptions are taken; (2) shall identify that part of the administrative law judge's decision to which objection is made; (3) shall designate by precise citation of page the portions of the record relied upon; and (4) shall state the grounds for the exceptions and shall include the citation of authorities unless set forth in a supporting brief. *Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded.*

29 C.F.R. § 102.46(b) (1983) (emphasis added). The general catchall language used by Daniel in its exception obviously fell far short of these requirements—a lapse compounded by its failure to brief or argue the interest rate issue before the Board.

Finding no "extraordinary circumstances" justifying Daniel's bypass of the Board with respect to this issue, we grant the application for enforcement.

ENFORCED.

---

specifically identifies those employees receiving job offers at other Daniel sites. Daniel's actual objection, of course, is that this evidence was not found to be of sufficient weight to negate the Board's *prima facie* case of unlawful discharge. In this regard, we point out a critical distinction between *B.E. & K. Inc.*, and the present case. In *B.E. & K.*, the laid-off workers were promised unconditional rights to their former jobs when business conditions improved—an act clearly inconsistent with a company's intent to purge itself of union adherents. In contrast, none of Daniel's workers were offered jobs anywhere near their current North Carolina homes at the time of their layoffs; nor was there a promise to re-employ them at Hercofina or DuPont if the business climate improved. This conduct is actually consistent with the Board's theory that the layoff was a convenient excuse for Daniel to rid itself of the elements of its work force favoring unionization at the North Carolina sites.