**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**FRIGID STORAGE, INC., Respondent.**

No. 90–2667.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1990.

Decided April 8, 1991.

As Amended by Order Filed June 3, 1991.

Margaret Ellen Luke, N.L.R.B., argued (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Charles Donnelly, Supervisory Atty., N.L.R.B., on brief), Washington, D.C., for petitioner.

J. Michael Ozier and Emily J. Lewis, Schottenstein, Zox & Dunn, argued, Columbus, Ohio (A.W. Vander Meer, Jr. and Sharon S. Goodwyn, Hunton & Williams, on brief), Norfolk, Va., for respondent.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.

K.K. HALL, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order finding that respondent Frigid Storage violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act. We grant enforcement.

I.

Frigid Storage ("Frigid" or "the Company") is a small business in Huntington, West Virginia. It sells and distributes groceries at wholesale, and employs about fifteen workers at a single warehouse. Edward Edmonds is the sole operator of the business, though it is owned by an Edmonds family trust.

In October 1986, the Steelworkers Union began a campaign to organize the warehouse workers. An employee of Frigid, Chancie Love, obtained authorization cards from the union and solicited employee authorizations. Love, Kenneth Kennedy, and Richard Franklin were among those who signed cards.

On October 20, 1986, the union informed Frigid by letter that it had the authorization of a majority of employees, and it therefore requested recognition as the employees' representative.

On October 22, with the union's letter in his hand, an enraged Edmonds called a meeting of all warehouse employees. Referring to the letter, he asked if any employees knew about the union. No one responded. He then told his employees that he hated unions, anyone who worked for unions, and blacks. He said that if a union were forced upon him he would cut wages, and he threatened to fire any employee who engaged in a strike.

During the next week, Edmonds interrogated employees about their union activities: whether they had spoken to anyone about it, whether they had signed cards, and what their sentiments were. He warned some that he would close the business if there was a strike. He told Kennedy that he knew Kennedy had been a union member in a former job.

The union filed a petition for an election on October 30. The next day, Edmonds gave another speech to his assembled workforce. He vowed that it would be "a cold day in hell" when there was a union at his company. He enumerated the objects of his hatred: unions, the Steelworkers in particular, lawyers, "niggers, welfare people, ... ministers, ... and the federal

government." He asked who had solicited and signed authorization cards. He described Love and Kennedy, both union members at previous jobs, as examples of workers who had been "failed" by unions. He threatened to begin wage bargaining at the minimum wage.

Finally, Edmonds pulled out his big guns. He announced that he would terminate two employees that day and possibly one on Monday, November 3, because business was "getting slow." Love jumped to his feet and said that he knew that he was one of the targets. He said that Edmonds lacked "a hair on his ass," that he (Love) knew the labor laws from front to back, and that when he owned the company he would fire Edmonds. At the end of the meeting, Edmonds discharged Love and Kennedy, Love for misconduct at the meeting and Kennedy for "unsatisfactory work performance." On Monday, November 3, he called Franklin in, explained that "the economy is down," and fired him. Franklin received a written termination letter stating that he was "unsuitable for the work conditions." By Friday, November 7, Frigid had hired five new employees.

Later in November, after consulting an attorney, Edmonds offered the three their jobs back in order to reduce potential back pay liability. Kennedy declined the offer, Love returned at that time, and Franklin returned January 19, 1987.

Also in mid-November 1986, and again on his attorney's advice, Edmonds instituted a written warning system for work infractions, so that, in Edmonds' words, when he "wanted to get rid of someone," he would have proof to support termination. He stated that he planned to issue a "stack" of warnings and then bring them to his lawyer to see if he had enough to fire anyone.

The form warning advised employees that the "offense or grievance described must be remedied or it will endanger your employment."

On December 9, 1986, the NLRB conducted a representation election. There were seventeen votes cast: six for the union, seven against, and four challenged. Three of the challenged voters were Love, Kennedy, and Franklin. The Board scheduled the challenges, along with the numerous unfair labor practice charges that had by then been filed, for hearing before an administrative law judge.

More unfair labor practices were forthcoming, however. After less than three weeks back, Franklin was fired again on February 5, 1987. The ostensible reason for the firing was violation of the company's policy against "profanity," but the facts were less dreadful than "profanity" might suggest—Franklin brought a whoopie cushion to work, and horseplay had ensued.

In June 1987, after initial hearings before an ALJ, Edmonds unilaterally revoked the longstanding employee practice of eating lunch in the warehouse. There had never been any such prohibition in the past, supervisors as well as workers had eaten lunch there, and Edmonds had acquiesced. Edmonds' proffered reason for prohibiting the employees from spending their lunch break in the warehouse was that the Fair Labor Standards Act would require him to pay for the lunch time.[1]

Finally, though he had rehired Love to cut backpay liability, Edmonds ordered his supervisors to cut Love's case count in order to, according to a supervisor, "blackball Mr. Love out of here." The same supervisor told another employee that if

---

1. As the NLRB points out in its brief, Edmonds' misreading of an FLSA bulletin is so blatant as to be obviously contrived. As common sense might predict, an employer need only pay for meal time if he *requires* employees to remain at their work station during the meal. 29 C.F.R. § 785.19, *reprinted in* Interpretive Bulletin, Part 785, Hours Worked Under the Fair Labor Standards Act of 1938, WH Publication 1312 (December 1986).

Another retrospective justification offered by Edmonds was a warning he received from the West Virginia Department of Agriculture after an inspection revealed pop cans, juice cans, and wrappers in the warehouse. This warning did *not obligate Edmonds to prohibit eating in the* warehouse; moreover, this inspection was conducted August 11, 1987, two months *after* Edmonds instituted the no-eating policy. Therefore, it could not have played any role in his decision.

Love's case count got low enough, "that would be an excuse to lay [him] off." So it happened. On June 19, 1987, citing Love as the "most expendable" employee, the Company laid him off for three weeks.

On March 1, 1988, the ALJ issued his decision on the challenged ballots and the numerous unfair labor practice charges. The Judge found that the discharges of Love and Kennedy on October 31, 1986, violated the Act, as did many of the threats and interrogations made by Edmonds in October and November 1986. He dismissed all other charges. On review by the NLRB, it adopted the unfair labor practices found by the ALJ, but disagreed with the dismissal of some of the other charges. In particular, the NLRB found that the institution of the written warning system, ban on eating lunch in the warehouse, three-week layoff of Love in June 1987, and both discharges of Franklin (November 3, 1986, and February 5, 1987) violated the Act.[2]

■ The Board petitions for enforcement of its order.

## II.

[A Court of Appeals'] review of the Board's findings of [NLRA] violations is, of course, limited. "If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first place."

*NLRB v. Nueva Engineering, Inc.*, 761 F.2d 961, 965 (4th Cir.1985) (citations omitted). Frigid argues that because the Board reversed some of the ALJ's conclusions, the standard of review is higher: a "special scrutiny." *E.g., Weather Shield Manufacturing v. NLRB*, 890 F.2d 52 (7th Cir.1989). However, there is an important distinction between an ALJ's findings as to credibility of witnesses and those drawing inferences or applying applicable law. Because the

Board did not overrule any of the ALJ's findings of underlying fact, but rather drew different inferences and legal conclusions from them, the "substantial support" standard applies. *American Thread Co. v. NLRB*, 631 F.2d 316, 320 (4th Cir.1980).

[2] In responding to the petition for enforcement, Frigid Storage has limited its challenge to three of the individual charges: (1) Franklin's November 3, 1986, layoff; (2) the written warning system; and (3) the ban on lunch in the warehouse. As to the parts of the order the company has not contested, the Board is entitled to summary enforcement. *NLRB v. Daniel Construction Co.*, 731 F.2d 191 (4th Cir. 1984). Moreover, the Company cannot contest certain charges in a vacuum by not contesting others. The unchallenged violations remain in the case, "lending their aroma to the context in which the issues are considered." *NLRB v. Clark Manor Nursing Home Corp.*, 671 F.2d 657, 660 (1st Cir.1982).

## III.

[3] Section 8(a)(3) of the NLRA prohibits an employer from discriminating "in regard to hire or tenure" to discourage membership in a labor organization. The Board found that Franklin's November 3, 1986, discharge violated § 8(a)(3). The Company launches two attacks at this holding. First, the Company argues that Franklin was a poor employee who often engaged in misconduct. On the contrary, Franklin's supervisor described him as the "best at putting up stock," and the primary piece of "misconduct" relied upon by the Company is the whoopie cushion incident, which preceded Franklin's later discharge in February 1987. Surely misconduct in February cannot justify a firing the previous November. Furthermore, the Company has not challenged the Board's finding that the February discharge, which followed Franklin's whoopie cushion antics, violated the Act.

---

**2.** In the certification election, two of the four challenged ballots were ultimately counted (Franklin and Love). Kennedy's would have been counted, but he had already accepted a

position elsewhere at the time of the election. Both Franklin and Love voted for the union, so the union won the election eight to seven.

■ Second, the Company tries to show that it did not know that Franklin was a union supporter. Though employer knowledge is obviously relevant, it is not dispositive, especially in a multiple-employee discharge. Layoffs intended to "discourage membership in any labor organization" violate the NLRA, even if the employer wields an undiscerning axe, and anti-union employees suffer along with their pro-union counterparts. *Birch Run Welding & Fabricating v. NLRB*, 761 F.2d 1175 (6th Cir.1985); *Merchants Truck Line v. NLRB*, 577 F.2d 1011 (5th Cir.1978); *Majestic Molded Products, Inc. v. NLRB*, 330 F.2d 603 (2d Cir.1964). The issue is the employer's motivation, and he cannot cleanse an impure heart with ignorance of individual employee sentiments. By the bare timing of Franklin's discharge on the Monday following Edmonds' Friday anti-union tirade, at which Edmonds had threatened to discharge an employee on Monday, we would have to conclude that the Board had substantial evidence to support its finding that Franklin's discharge violated § 8(a)(3). See *NLRB v. S.E. Nichols*, 862 F.2d 952, 959 (2d Cir.1988), *cert. denied*, 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989) (timing of discharge made employer motivation "stunningly obvious"). Moreover, aside from the timing, the pretextual nature of the reason given Franklin for his discharge ("economy is down"), as demonstrated by Frigid's hiring of five new workers the next week, lends a great deal of support to the Board's conclusion that Franklin's discharge was motivated by anti-union animus.

## IV.

Both of the other challenges to the Board's order involve a single type of unfair labor practice: an employer's change in working conditions in retaliation for union activities or support. These retaliatory measures violate § 8(a)(1) (interference with employees' free exercise of rights to organize, belong to, or assist labor organizations) and sometimes § 8(a)(3) (discrimination as to hire or tenure).

## A.

■ A new system for discipline violates the Act if implemented in retaliation for union activity. *NLRB v. Lester Bros., Inc.*, 301 F.2d 62 (4th Cir.1962); *Electri-Flex Co. v. NLRB*, 570 F.2d 1327 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). Even where the new system does not change the standards of conduct, a change in the method of communicating warnings in retaliation for union activity is unlawful. *International Business Systems*, 247 NLRB 678 (1980), *enf'd mem.*, 659 F.2d 1068 (3d Cir.1981).

The Company admits that the union's organization drive prompted the new system, but argues that its purpose was solely to document employee misconduct. The Board counters that the Company could have achieved its professed goal by simply keeping good records. These sternly-worded written warnings, born amidst and prompted by a fierce organizational battle, must inevitably chill the employees' freedom to organize, and the Board found that the inevitable was the intended. In the context of the numerous uncontested unfair labor practices committed by Edmonds and the clear proof of his anti-union animus, the Board had substantial support for its finding that institution of the written warning system was retaliatory.

## B.

■ The final contested charge is the Board's finding that the ban on eating lunch in the warehouse violated the Act. As we described above in footnote 1, Frigid's proffered excuses for this change in working conditions are so obviously contrived that retaliatory intent can almost be inferred from them. In any event, the timing of the change (soon after the first hearings before the ALJ) convinced the Board that "by revoking for an invalid reason a longstanding employee practice after employees had testified about [Frigid Storage]'s unfair labor practices, [Frigid] engaged in a further reprisal for the employees' union support and thereby violated Section 8(a)(3) and (1) of the Act." This

conclusion has substantial support in the record.

We grant enforcement of the Board's order.

ENFORCEMENT GRANTED.