983 F.2d 1056
 142 L.R.R.M. (BNA) 2760
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MINETTE MILLS, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
National Labor Relations Board, Petitioner,
v.
Minette Mills, Incorporated, Respondent.
 Nos. 92-1142, 92-1214.
 United States Court of Appeals,
Fourth Circuit.
 Argued: September 30, 1992
Decided: January 7, 1993
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Charles Preyer Roberts, III, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, for Petitioner.
 Joseph John Jablonski, Jr., NATIONAL LABOR RELATIONS BOARD, for Respondent.
 Jerry M. Hunter, General Counsel, D. Randall Frye, Acting Deputy General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Collis Suzanne Stocking, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, for Respondent.
 NLRB
 ORDER ENFORCED.
 Before MURNAGHAN, NIEMEYER, and HAMILTON, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Minette Mills, Inc. ("Minette") has sought review of the December 31, 1991, order of the National Labor Relations Board (the "Board") charging Minette with unfair labor practices. The NLRB has crossapplied for enforcement of the order. Adopting the findings and rulings of the administrative law judge ("ALJ"), the Board concluded that Minette violated the National Labor Relations Act (the "Act"), § 8(a)(1), (3), 29 U.S.C. § 158(a)(1), (3) by discharging employees Debra and Douglas Wright for their support of union activities. In addition, the Board found that Minette violateds 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by ordering employees not to discuss the union on the premises except in the canteen, by interrogating employees concerning union activities, by making unspecified threats of reprisals against union supporters, and by threatening employees with reduced wages, facility shutdowns, and loss of jobs as a result of union support. The NLRB ordered Minette to offer reinstatement to employees Debra and Douglas Wright without prejudice and to cease all unfair labor practices.[1] We grant enforcement of the Board's order.
 
 I.
 BACKGROUND FACTS
 
 2
 Minette operates a textile plant in Grover, North Carolina. Early in 1990, employees of Minette and the Amalgamated, Clothing, and Textile Workers Union (the "Union") began discussions about organizing an election at the Grover plant. Employees Debra and Douglas Wright, husband and wife, began working for Minette in September 1989, Debra as a weaver and Douglas as a fixer of looms. Supporters of the Union campaign, the Wrights participated by handing out leaflets and authorization cards, discussing the Union with co-workers, and attending various employee meetings.
 
 
 3
 On or about April 19, 1990, owner Thomas Tang and plant manager John Caldwell conducted a meeting with second shift employees at which the union issue was hotly contested. Tang and another employee, Charles Cooke, debated union issues such as insurance and work conditions for much of the meeting. The employees openly expressed their support of the Union. Tang stated that a company plant in Maine had a union, and if anybody did not like his or her job, transfer was possible. Tang further stated that he wanted to "remember all of [the] faces" of the employees at the meeting. The Wrights and two other employees walked out of the meeting before Tang had finished speaking, and other employees later followed.
 
 
 4
 One day later, Caldwell spoke with employee Glenda Simpson, who informed Caldwell that she supported the Union. Caldwell warned her that the plant would reduce employee wages if they selected the Union. Three days after that, on or about April 23, 1990, Caldwell specifically asked Douglas Wright if he had been discussing the Union with co-workers. When Douglas answered"yes," Caldwell turned and left the room. Caldwell later asked both Wrights why they supported the Union and informed them that they could be fired for discussing the Union outside of the canteen. Minette had no rule that limited conversations prior to the Union campaign.
 
 
 5
 The Wrights regularly worked a shift that began at 2:00 p.m., and on or about April 27, 1990, during her shift, Debra Wright flagged (i.e., identified) her loom for repair. Alfred Causby, a co-worker and fixer, checked the loom but then left the area. Debra Wright tried but remained unsuccessful in operating the loom, and when Causby returned he said "if [she] would leave the god damn thing flagged that maybe he could fix the damn thing." His harsh manner apparently caused Debra to cry. When Douglas saw his wife and learned that Causby-a Union opposer-had said to another employee that "if Douglas wanted his wife's looms fixed, he should fix them himself," Douglas suggested they leave their posts and speak with their supervisor the next day. (The Wrights' supervisor, James Evans, worked during the first shift, and as usual, was not at the plant for the second shift.) A fight had erupted between two fixers two weeks earlier, and Douglas testified that he feared that, without any supervisor on duty, a fight would start between him and Causby. The Wrights testified that they informed co-worker Charles Cooke that they were leaving early. Minette admitted that any employee could be fired for engaging in a fight. Minette also admitted that an employee would be justified in leaving a shift in order to avoid a brawl.
 
 
 6
 The next day, the Wrights arrived early to meet with their supervisor. Because supervisor Evans again was not at the plant, plant manager Caldwell met with the Wrights. Caldwell admits stating something to the effect that "none of this started until the Union started trying to get in" after the Wrights explained their story. Told to wait until supervisor Evans could meet with them, the Wrights returned on Monday, April 30. This time they were met by supervisor Evans and Personnel Director Wanda Neal. Neal informed the Wrights that Minette considered them as having "automatically quit" by walking off their shift. The Wrights denied voluntarily quitting, insisted that they had informed a co-worker of their early departure, and repeated their story. Co-worker Causby and other employees admitted that it was common for night shift employees to inform another employee if they had to leave early. Moreover, no supervisor, representing Minette, ever spoke with Alfred Causby to confirm or deny the Wrights' version of that evening's events.
 
 
 7
 After the Wrights' departure, the union disputes continued. In May 1990, Personnel Director Neal conducted several meetings at which she informed employees that plants closed because of union inefficiencies. Although Neal testified that she covered numerous issues at the meetings, much time was spent on plant closings and the correlation to unions. Neal displayed various charts such as:
 
 
 8
 In 5 years-
 
 600 Closed Plants
 
 9
 ACTWU!
 
 
 10
 53,000 Lost Jobs!
 
 
 11
 Other charts and visual aids listed closed unionized plants and the number of employees who subsequently lost their jobs. Employee Glenda Simpson testified that Neal indicated that the Grover plant would face the same fate if the Union won the election. Neal admitted to failing to say anything at the meetings about the fact of non-union plant closures.
 
 II.
 
 12
 If the Board's findings and conclusions are supported by substantial evidence taken from the record as a whole, the reviewing court should not disturb the Board's order. Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951); Act § 10(e), 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). The Board's choice between two "fairly conflicting views" therefore should stand even if the court finds that it would have justifiably drawn a different conclusion. Universal Camera, 340 U.S. at 488; see also ARA Leisure Servs., Inc. v. NLRB, 782 F.2d 456, 459 (4th Cir. 1986); NLRB v. Daniel Construction Co., 731 F.2d 191, 193 (4th Cir. 1984).
 
 A.Section 8(a)(3) Violations
 
 13
 Section 8(a)(3), 29 U.S.C. § 158(a)(3), of the Act makes it unlawful for an employer to discharge an employee because of union activities. An employer therefore violates the Act if his or her opposition to union activities marks a substantial or motivating factor in the decision to discharge an employee. See NLRB v. Transportation Management Corp., 462 U.S. 393 (1983); NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 967-68 (4th Cir. 1985). The employer's only recourse is to demonstrate that the termination of employment would have occurred even in the absence of the employee's support for union activities. See Transportation Management Corp., 462 U.S. at 399-400; Salem Leasing Corp. v. NLRB, 774 F.2d 85, 87 (4th Cir. 1985); Nueva, 761 F.2d at 967. When the employer offers an allegedly legitimate business reason for dismissal, creating a "dual motive scenario," " 'the evidence must demonstrate why the good motive was not the sole reason for the discharge.' " McLean Trucking Co. v. NLRB, 719 F.2d 1226, 1227 (4th Cir. 1983) (quoting NLRB v. Kiawah Island Co., 650 F.2d 485, 491 (4th Cir. 1981)).
 
 
 14
 The Board may find improper motive-a question of fact-through both direct and circumstantial evidence. See, e.g., Nueva, 761 F.2d at 967. In the instant case, the Board found that Minette improperly discharged Debra and Douglas Wright because of their support for union activities and failed to prove that the Wrights would have been discharged in the absence of their protected activities. The meeting attended by the Wrights, their conversations with management, and the events surrounding their last shift work provide substantial evidence to support a finding of unlawful motive. Moreover, the Board's conclusion that Minette's proffered reasons for the termination of employment were pretextual likewise is supported by the record.
 
 
 15
 First, several encounters between the Wrights and Minette leaders reveal hostility toward and knowledge of Union supporters like the Wrights. The Wrights attended the April 19 meeting, conducted by company owner Tang and plant manager Caldwell, at which tempers flared over the Union issue. Debra Wright already had been openly handing out authorization cards for the Union and discussing the issue with co-workers. She testified that she questioned Tang several times at the meeting about why he had not promised the employees better conditions and wages before the Union campaign and received no answer from him. Tang's statements about Union supporters hinted at retaliation from the company, and he mentioned wanting to remember everyone's faces at the meeting. Finally, the Wrights and other employees boldly walked out of that meeting, in front of Tang and Caldwell.
 
 
 16
 Only a few days later, plant manager Caldwell came up to Douglas Wright, who was at work on a machine, and asked only if he had been discussing the Union with co-workers. The Wrights later asked Caldwell if they could be discharged for discussing the Union. Caldwell directly warned the Wrights that they could face discharge for discussing the Union outside of the canteen. Minette's"no talking rule" emerged only as the Union campaign gained momentum. Caldwell also asked the Wrights if they supported the Union and, if so, why.[2] Both Wrights explained their support for the Union. Moreover, when the Wrights met with Caldwell the day after they left their posts early, Caldwell's response to their concerns was: "none of this started until the Union started trying to get in." Clearly the Union and its supporters occupied Caldwell's mind. All of his comments, it should be emphasized, were directed to the Wrights almost immediately after they attended and spoke at the April 19 heated meeting.[3]
 
 
 17
 Minette has pointed out that neither Tang nor Caldwell was present when the Wrights were told that the company considered them as having voluntarily quit. That final meeting was conducted by supervisor Evans and Personnel Director Neal. It was, however, reasonable for the Board to infer, from the instances above described, that management at the Grover plant, through communications among the offices, knew of and generally disfavored the Wrights' support for the Union. Indeed, according to Minette, Caldwell met with Evans and Neal Monday morning and informed them of his conversation with the Wrights and their situation. Knowledge of and hostility toward employee union support provides some evidence of improper motive. See Daniel Construction Co., 731 F.2d at 197; Jeffrey Mfg. Div., Dresser Indus., Inc. v. NLRB, 654 F.2d 944, 949 (4th Cir. 1981).[4] As Minette further pointed out, the Wrights simply walked off of the job, leaving their posts abandoned. Their actions, Minette has argued, provided the company with ample reason to regard the Wrights as having voluntarily quit. Employers retain the right to discharge employees-even those supportive of unions-for legitimate business reasons. See, e.g., McLean, 719 F.2d at 1232; Transportation Management Corp., 462 U.S. at 401. The Board reasonably found, however, the existence of substantial evidence indicating that Minette's reasoning did not ring true. "When confronted with evidence of a legitimate business motive, the General Counsel must prove by a preponderance of the evidence that union antipathy did actually play a part in the decision to discharge." Standard Prods. Co., Rocky Mount Div. v. NLRB, 824 F.2d 291, 293 (4th Cir. 1987).
 
 
 18
 Undertaking no investigation into the Wrights' story, Minette assumed the Wrights had voluntarily quit and then informed them of their termination. Personnel Director Neal testified that Minette had a "past practice" of automatic termination for employees who left a shift. The ALJ found that Neal's testimony raised issues of credibility and that the "automatic termination" policy was not supported by the record. The record reveals that Minette's policy in fact varied and that some employees who walked off of a shift were permitted to return to work. Indeed, several employees-who retained their positions-had abandoned shifts, sometimes informing a supervisor and sometimes not, because of anger over their work. Employee Vera Ellis, for example, testified that when angered and upset because she could not find someone to repair her looms, she had left early and had not been dismissed. Employee Keith Springs walked out for part of his shift over a pay dispute and still returned to work. No written policy about leaving shifts and termination existed for employees, and, at the very least, Minette's reactions to employees leaving shifts clearly were not consistent. On the occasions described above, Minette worked out the situation, speaking with the employees and investigating the employees' justifications and frustrations.
 
 
 19
 Personnel Director Neal admitted that engaging in fights creates cause for discharge and that fear of a fight provides, under certain circumstances, proper justification for leaving a shift. Other justifications included sickness and emergencies. Minette admitted that, despite such a policy providing for excuses and justifications, it undertook no investigation, questioned neither Causby or other employees, of the Wrights' justification for leaving their posts.[5] When the Wrights told Caldwell that employee Causby had used profanity when raising his voice to Debra Wright, had appeared somewhat hostile, and had failed to fix the loom, even Caldwell said he "could settle the problem" but did not want to "go over James Evans' head." Even if the Wrights did not have reasonable justification to leave,[6] Minette made no effort to investigate that fact, and if it had, the evidence does not show that all employees who left a shift were"automatically" fired. Disparate treatment of an employee provides some evidence of unlawful motivation. See, e.g., Transportation Management Corp., 462 U.S. at 404 (discharge was not commonplace for transgressors like the discharged employee and the employee was given no warnings before discharge); American Thread Co. v. NLRB, 631 F.2d 316, 322 (4th Cir. 1980) (in finding unlawful discharge, court noted that the cursory investigation and severe punishment of discharge showed disparate treatment due to union sympathy).
 
 
 20
 Moreover, the record does not reveal that the Wrights had prior records of reprimands or unsatisfactory work justifying a hasty dismissal. See Standard Products, 824 F.2d at 293 (cases upholding finding of unlawful discharge often focus on workers with good records); McLean, 719 F.2d at 1230 (proper weight should be given to evidence of employees' repeated performance deficiencies as a valid basis for discharge). In fact, one of the Wrights' personnel action forms contained in the record reveals marks in the highest category for performance ratings. By contrast, most of the personnel action forms in the record of other employees who"voluntarily quit" contained lower marks for work performance.
 
 
 21
 Minette offered evidence that, from 1988 through 1990, at least 14 employees who left a shift were assumed to have quit and discharged. Some of those employees were terminated before the Wrights, but over a third were terminated not long after the Wrights' discharge. The record is unclear on whether those employees notified someone of leaving, failed to give Minette any justification for leaving, or actually intended to quit. Furthermore, in contrast to the Wrights' behavior, only some of those employees who were assumed to have quit returned to the plant to meet with Minette officials-and even then they returned days or weeks later not to offer justifications but to seek a new job. The Wrights testified that they first had reported to coworker Charles Cooke their reasons for leaving their shift. Supervisor Evans was routinely not in the plant during the second shift, and several employees, including employee Causby, confirmed that it was common to inform a co-worker of the need to leave early from the second shift. On the second shift, there simply was no management with which to speak. In addition, the Wrights returned not days or weeks later but the next day-ahead of their shift-to speak with their supervisor about their behavior. Finally, we note that the personnel action forms in the record for the 14 employees who were assumed to have quit all are marked with "not recommended for rehire." By contrast, one of the Wright's forms shows a "yes" for recommended rehire, as well as the top marks for performance ratings. In light of the lack of a consistent, established practice, Minette treated the Wrights unusually firmly by so quickly dismissing them from their jobs without further consideration.
 
 
 22
 Finally, the court cannot overlook the weighty factor of timing. The Wrights' display of Union support and their conversations with Minette management about the Union occurred only days before their final meeting with their supervisor. See, e.g., NLRB v. Frigid Storage, Inc., 934 F.2d 506, 510 (4th Cir. 1991); Salem, 774 F.2d at 88-89 (discharge followed employees' favorable remarks about a unionized corporation). Dismissal of Union supporters, not long after a heated meeting at which several employees displayed support for the Union, obviously would have had an impact on the then upcoming Union election.
 
 
 23
 All of the foregoing factors, when examined as a whole, provide substantial, though perhaps not overwhelming, evidence that the Wrights' support for the Union marked a motivating factor in Minette's decision to dismiss them so readily as "voluntary quitters." The admitted anti-union remarks and sentiment of Minette leaders, the general air of hostility of Minette toward the Union at the April 19 employee meeting and during the Wrights' conversations with Caldwell reveal knowledge of the Wrights' Union sympathy and general opposition to that sympathy. In light of the summary process with which the Wrights-though satisfactory workers-were dismissed and the evidence revealing varied treatment of employees leaving shifts early, the Board also was justified in finding that Minette failed to establish that the Wrights would have been terminated in the absence of their support for the Union." If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first place." Daniel, 731 F.2d at 193 (citing Universal Camera, 340 U.S. at 474); see also NLRB v. Instrument Corp. of America, 714 F.2d 324, 328 (4th Cir. 1983) (noting that if the Board's conclusions drawn from credibility findings and inferences are reasonable, its decision should stand). We therefore affirm the Board's order finding that Minette violated Section 8(a)(3) of the Act by discharging the Wrights.
 
 B.Section 8(a)(1) Violations
 
 24
 Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), protects employees by making it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights to join or support union activities. We assess the coercive or intimidating nature of employers' words or actions in light of the totality of the circumstances. See Nueva, 761 F.2d at 965 (did the conduct have a "reasonable tendency in the totality of the circumstances to intimidate"); Corrie Corp. v. NLRB, 375 F.2d 149, 153 (4th Cir. 1967); see also NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969) (noting that an inquiry into coercion or intimidation must "take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear").
 
 
 25
 We affirm the Board's conclusions that, under the totality of the circumstances, Minette violated Section 8(a)(1) by making unspecified threats of reprisals against Union supporters, by interrogating employees concerning Union activities and by enforcing a no-talking rule which prohibited employees from discussing the Union at any time except in the canteen, and by threatening employees with reduced wages, facility shutdowns, and loss of jobs as a result of Union support. Minette's actions occurred at a critical time in the Union campaign and amidst a general atmosphere of anti-union sentiment on the part of Minette management.
 
 
 26
 At the April 19, 1990, meeting between second shift employees, company owner Tang, and plant manager Caldwell, Tang opened the meeting asking the group why they wanted a union. Tang directly told the employees that if they did not like their jobs (thus arguably implying that their show of interest in the Union meant to Tang that the employees were unhappy with their jobs at Grover), they knew where the door was and should go to the unionized Bates plant in Maine. According to Debra Wright, whose testimony the ALJ credited, Tang stated "he wouldn't have a union [here]." When Debra Wright asked a question that showed her Union sympathies, Tang menacingly walked "right up to her face" and said nothing. Finally, Tang also stated he wanted to "remember the faces" of everyone there, many of whom were clear Union supporters.
 
 
 27
 We find that it was reasonable for the Board to have concluded that Tang was making implied threats of unspecified retaliation to admitted Union supporters. See Gissel, 395 U.S. at 618 (an employer can communicate his general views about unions "so long as the communications do not contain a threat of reprisal or force or promise of benefit"); NLRB v. General Wood Preserving Co., 905 F.2d 803, 80708, 822-24 (4th Cir.), cert. denied, 111 S. Ct. 590 (1990) (various employer comments, such as "don't vote [yourself] into a sea of trouble" and "the high risk" of unionizing, amounted to unlawful unspecified threats of reprisal). Tang's remarks had a vindictive quality, hinting not only at his anger and frustration but at the possibility of reprisals.[7] Moreover, the meeting occurred, as the ALJ noted, at a critical time during the Union campaign, thus adding to the intimidating quality of Tang's presentation.
 
 
 28
 The record also supports the Board's finding that plant manager Caldwell unlawfully interrogated employees about the Union, threatened discharge for violating a rule prohibiting discussions about the Union except in the canteen, and by threatening a reduction of wages if the Union won the election. Only a few days after the meeting, Caldwell directly asked the Wrights if they supported the Union and had been discussing it. According to Douglas Wright, Caldwell walked up to him and asked if he and two employees had been "talking about the Union." Caldwell walked away, saying nothing, when Douglas answered "yes." Although both Wrights had engaged in proUnion activities, the record suggests that at the time of the questioning, Minette management was directly aware only of Debra Wright's Union sympathies through her questions at the April 19 meeting with Tang.
 
 
 29
 Later that same day, Debra Wright and her husband went up to Caldwell and directly asked him if their jobs were in danger for discussing the Union. Clearly Caldwell's questioning earlier that day had frightened the Wrights-they feared for their job security. In response, Caldwell replied "yes," warning them that discussions about the Union could occur only in the canteen. He then asked the Wrights if they were supporting the Union and, if so, why. Caldwell did then offer to arrange a meeting for the Wrights with personnel to discuss insurance benefits and other issues.
 
 
 30
 Questioning an employee about his or her union sympathies does not constitute, alone, coercive, unlawful conduct. See, e.g., Nueva, 761 F.2d at 965; see also Excavation-Construction, Inc. v. NLRB, 660 F.2d 1015, 1022 (4th Cir. 1981). Instead, the court must consider such factors as the history of employer hostility to union presence, the nature and place of the questioning, and the identity of the questioner. See, e.g., Nueva, 761 F.2d at 966. Again, the ALJ was impressed by the Wrights' demeanor and was unimpressed with Caldwell's. Caldwell's comments and questions, right on the heels of the heated meeting attended by Caldwell, could suggest intimidation and possibilities of discharge. There already was an atmosphere of Minette hostility to Union supporters, as evidenced by the employee meeting on April 19. Compare Excavation-Construction, Inc., 660 F.2d at 1022 (the company had no history of union hostility-an important factor in finding no improper interrogation). Caldwell, a figure of authority at Grover, also never explained to Douglas Wright his purpose in coming up to him and asking him only about his Union support. See Nueva, 761 F.2d at 966 (fact that foreman did not explain the purpose of his questioning of employee was a factor adding to the coercive nature of the interrogation). Caldwell did not merely approach an employee and inquire into whether that employee had been talking to the detriment of his work, but instead asked only if Douglas Wright had been discussing the Union.
 
 
 31
 In defense of Minette, neither of Caldwell's conversations with the Wrights occurred in an office situation (often a more intimidating atmosphere), and the Wrights themselves initiated one of the conversations. See Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1139-40 (4th Cir. 1982), cert. denied, 460 U.S. 1083 (1983) (court noted that the coercive interrogations occurred in offices with locked doors). The threat of discharge for speaking outside of the canteen, however, did enter the conversations and, again, Caldwell was a clear figure of authority with the power to direct a termination. Making such a threat during the conversation added to the coercive and intimidating nature of Caldwell's questioning. See Nueva, 761 F. 2d at 966. The Board noted that the record revealed no other rules limiting talking at the plant until April, 1990. Nor had Minette ever enforced a rule limiting discussions about other subject matters. Minette's rule, designed to confine Union supporters, reveals Minette's unlawful intent to chill employee union discussions. See Frigid Storage, 934 F.2d at 510 (changes in longstanding employee practices-such as a ban on eating lunch in the warehouse and instituting a new discipline system-amidst a union organization drive were motivated by retaliatory intent and in violation of the Act).
 
 
 32
 In addition, Caldwell also spoke with employee Glenda Simpson at her work station on April 20, 1990-two days before his talk with the Wrights, and only one day after the heated April 19 employee meeting. Simpson informed Caldwell that she supported the Union. After expressing his frustration with the Union campaign (it was "about to run him crazy"), Caldwell told Simpson that the wages of employees would decrease if the Union won the election. When Simpson protested that the Board would prohibit such conduct, Caldwell responded "you don't know the Chinese." The record indicated that Minette employees frequently referred to Minette owner Tang as a "Chinese." The ALJ was impressed with and persuaded by Simpson's testimony and interpreted Caldwell's comment as an unlawful threat of economic reprisal-specifically a threat to reduce wages-in response to Union support.
 
 
 33
 In sum, substantial evidence supports the Board's finding that Minette interfered with employees' protected rights and therefore violated Section (8)(a)(1) by interrogating employees about their Union activities, instituting a no-talking rule against Union discussions and threatening violators with discharge, and threatening loss of wages if the Union won the election.
 
 
 34
 In addition to the above evidence of threats, substantial evidence also supports the Board's finding that Minette again violated Section 8(a)(1) by threatening plant closure at meetings conducted by Personnel Director Neal. See, e.g., Nueva, 761 F.2d at 966 (threatening to close plant or institute layoffs if employees select union representation violates Act). During her presentations, Neal admits to speaking only of unionized plants and their subsequent shut downs due to "union inefficiency." She also indicated that Minette strongly opposed the Union. Neal named each unionized plant that had closed-one-byone-and the number of employees who had lost their jobs. Her numerous charts and visual aids repeatedly emphasized the association of unions to layoffs, unions to plant closures. No comments were made about non-union plant closures.
 
 
 35
 Employee Glenda Simpson also recalled that Neal warned "their plant would wind up like that if the Union came in." Talk of plant closure is lawful only if "phrased on the basis of objective fact [designed] to convey an employer's belief as to demonstrably probable consequences beyond his control." Gissel, 395 U.S. at 618; see also Act § 8(c), 29 U.S.C. § 158(c). The ALJ was convinced that Glenda Simpson testified truthfully and was unable fully to credit Neal. See NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141, 145 (4th Cir. 1983) (noting that the ALJ's credibility findings, when adopted by the Board, generally are accepted by the reviewing court, absent exceptional circumstances). The mainstay of Neal's program was to focus all attention on the sheer loss of jobs at multiple unionized plants. Given the nature of the employer/employee relationship and the necessary tendency of employees "to pick up intended implications," we sustain the Board's finding that Minette violated Section (8)(a)(1) by threatening plant closure. Gissel, 395 U.S. at 617.
 
 
 36
 In sum, we note that many of the events discussed above, particularly the exact language used by Minette officers, turn on credibility findings. The Board upheld the ALJ's credibility determinations, stating that its established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces it that they are incorrect. We find that substantial evidence exists to support the Board's findings of violations of Section 8(a)(1).
 
 
 37
 The NLRB's order is ENFORCED.
 
 
 
 [1]
 An election was held at Minette with 74 votes for the Union and 91 votes cast against the Union. The Board subsequently ordered a second election by secret ballot. That part of the order is not before us
 
 
 [2]
 The events described above involving Tang and Caldwell also were found to constitute separate violations of the Act and are discussed further infra
 
 
 [3]
 The ALJ noted that he was not persuaded by Caldwell's testimony, a credibility finding upheld by the Board. Caldwell's demeanor did not impress the ALJ, and Caldwell demonstrated difficulty recalling events. The ALJ was very impressed by the Wrights and their testimony
 
 
 [4]
 Minette found it significant that the Wrights' enthusiasm for the Union paled in comparison to other employees. But as plaintiffs point out, evidence that an employer did not discharge all union supporters, particularly the strongest supporters, does not disprove a discriminatory motive already revealed. NLRB v. Instrument Corp. of America, 714 F.2d 324, 330 (4th Cir. 1983). The Wrights admitted to their superiors that they supported and discussed the Union and walked out of a Minette meeting to show that support. There is no rule that only notorious union supporters can be unlawfully discharged. Moreover, Minette may have valued the skills of the more vocal Union supporters over the Wrights' skills, thus leading to the wrongful discharge of only the Wrights
 
 
 [5]
 Minette has asserted that it regarded the Wrights' fears that evening as baseless, although, again, it never investigated the issue to prove its point. Minette has suggested that the "case turns on an evaluation of the justification proffered by the Wrights for walking off the job." Some of the evidence, though by no means all, concerning conversations and events depends on evaluating the justifications and demeanor of the Wrights and Minette personnel. As mentioned, the ALJ was favorably impressed with the Wrights, their demeanor, and their testimony and set out his reasons in the record. The Board concurred and such evaluations of facts and testimony deserve deference, particularly where the evidence includes "conflicting testimony" and "credibility determinations." Nueva, 761 F.2d at 965
 
 
 [6]
 The NLRB has pointed out that by leaving the shift, the Wrights gave up half a day's pay-no small figure for the plant workers-as revealing of the extent and good faith of the Wrights' concerns
 
 
 [7]
 Tang did not testify, but his opposition to the Union is supported by the record. Sometime in May, Minette read (and circulated) a letter to employees written by owner Tang. The letter discussed Tang's unhappiness with the changes in attitudes and work production of the employees since the Union movement began and his concern that this plant would suffer the same fate as the unionized Bates plant. Tang saw the Bates plant as heading for a shut down as a result of union inefficiencies. The letter included statements like "union inefficiency could bring a cloud on Minette future," a "union victory could be a defeat for employees" etc. Clearly Tang was not a supporter of the Union. The ALJ, although admitting that the letter contained subtle threats of plant closure (especially in light of other displays of anti-Union sentiment by Minette), did not find this letter to be a violation of the Act in light of the overly vague quality of Tang's threats