**SALEM LEASING CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 84–1758.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1985.

Decided Oct. 3, 1985.

Penni L. Pearson, Winston-Salem, N.C. (W.R. Loftis, Jr., Petree, Stockton, Robinson, Vaughn, Glaze & Maready, Winston-Salem, N.C., on brief) for appellant.

John F. Welsh, Washington, D.C., (Elliott Moore, Deputy Associate Gen. Counsel, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Collis

Suzanne Stocking, Washington, D.C., on brief) for appellee.

Before WIDENER, ERVIN and SNEEDEN, Circuit Judges.

PER CURIAM:

Salem Leasing Corporation ("Salem") petitions this Court to review an order issued by the National Labor Relations Board ("NLRB") finding that Salem violated Section 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) and (1), in discharging one of its employees, Cecil Shields. The NLRB cross-applies for enforcement of its order. We find that there is substantial evidence to support the NLRB's finding of a violation, and we accordingly grant enforcement of its order.

## I.

Salem is a truck leasing company with eight locations in North Carolina. Cecil Shields, who was hired by Salem in June 1982, worked at its facility in Hickory, North Carolina. Shields was hired as a "tire man." His responsibilities included changing tires on trucks, maintaining a tire inventory, and filling out the required paperwork. Shields was also given additional duties as a "fuel man" when the fuel man quit. Shields successfully completed Salem's 90–day probationary period for new employees. He was fired on October 26, 1982, one month after his probationary period had ended.

Shields had previously worked from 1973 to 1981 for General Electric at its unionized plant near Hickory but was laid off because of economic conditions. Shields was a member of the International Union of Electrical, Radio, and Machine Workers, AFL–CIO, a membership which he apparently maintained while working for Salem.

None of Salem's employees are represented by a labor organization.

Shields was fired one week after a company-sponsored and financed fishing trip to a campground in South Carolina which took place on October 17 and 18, 1982. On the evening of October 17, during a poker game in Shields' room, Shields responded to questions from fellow employees regarding his employment at G.E. and his union membership. He described his pay and benefits at G.E. and the amount of his union dues. He expressed a desire to return to G.E. because his pension there would vest in six months. He stated, however, that given current economic conditions he probably would not be rehired for a couple of years. At one point during the game, Shields commented on a pot won by another player saying, "[d]rag that little bit of change, or chicken feed. That's what I'm making."

Also at the poker game was a Salem Vice President, Henry Bondurant. Shields told Bondurant, during the game, that he liked his job at Salem. A day or two after the fishing trip, Bondurant called Thomas Teague, President of Salem, and told him that Shields had a "bad attitude." Teague then called Charles Ellis, the Vice President who ran the Hickory Facility, and told him that Shields had a bad attitude. Ellis fired Shields a few days later.

On October 29, 1982, Shields filed a charge with the Board alleging that his discharge was violative of Section 8(a)(1).[1] The General Counsel then issued a complaint on January 17, 1983, charging that Shields was fired in violation of Section 8(a)(1). That complaint was later amended on February 7, 1983, to include an allegation that Shields' discharge also violated Section 8(a)(3).[2] An administrative hearing

---

**1.** Section 8(a)(1) provides that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 ...". 29 U.S.C. § 158(a)(1). Section 7, in turn, states that employees shall have "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to

engage in other concerted activities for the purpose of collective bargaining or other mutual aid and protection...". 29 U.S.C. § 157.

**2.** Section 8(a)(3) provides that it is an unfair labor practice for an employer to encourage or discourage membership in any labor organization "by discrimination in regard to hire or

was held on February 24, 1983. On May 27, 1983, the Administrative Law Judge issued a decision finding that Salem had violated Section 8(a)(1) and Section 8(a)(3) and (1).[3] On June 29, 1984, the Board affirmed the portion of the ALJ's decision finding that Salem had violated Section 8(a)(3) and (1).[4]

Prior to and during the administrative hearing, Salem offered a variety of reasons for Shields' discharge. In an affidavit made prior to the hearing, Ellis cited poor work performance and also stressed that economic conditions necessitated firing some employees and that he had chosen to fire those with the least job tenure and the worst work performance. Joint Appendix at 220. At the administrative hearing, Ellis testified that Shields was fired because of his poor work performance and his bad attitude.[5] Joint Appendix at 7–8. The bad attitude initially described by Ellis, however, did not pertain to Shields' unfavorable comments on the fishing trip but to Shields' failure to promptly perform tasks he was asked to perform. Both Teague and Ellis testified that they and Bondurant did not discuss why Shields' attitude was bad. The ALJ commented as follows:

> Thus, according to Teague and Ellis, Bondurant told Teague that Shields had a "real serious" attitude, Teague then told Ellis that Shields had a "bad" attitude, and Shields was thereupon discharged but nobody told nobody what

kind of "attitude" they were referring to. I am constrained to express my serious doubt that the two conversations were so terse.

Joint Appendix at 158. In its appearance before this Court, Salem has emphasized Shield's bad attitude, as evidenced by his allegedly disloyal comments on the fishing trip, as the reason for his discharge.

## II.

As indicated earlier, Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment *to encourage or discourage membership in any labor organization*". 29 U.S.C. § 158(a)(3), (emphasis added). The ALJ and the NLRB found that Salem violated § 8(a)(3) and (1) because it fired Cecil Shields for fear that he would continue to speak favorably about union wages and benefits to his fellow employees, thereby encouraging their interest in union membership.

In an unlawful discharge case under § 8(a)(3) and (1), the General Counsel of the NLRB has the burden to prove that employer opposition to union activity was a motivating factor in the employer's decision to fire an employee. If the General Counsel establishes this prima facie case, the employer then has the burden to demonstrate, by a preponderance of the evidence, that the employee would have been fired anyway. *NLRB v. Transportation*

---

tenure of employment or any term or condition of employment...." 29 U.S.C. § 158(a)(3).

**3.** A violation of Section 8(a)(3) involves a derivative violation of Section 8(a)(1). *Metropolitan Edison Co. v. NLRB.* 460 U.S. 693, 698, 103 S.Ct. 1467, 1472, 75 L.Ed.2d 387 (1983).

**4.** The Board, having affirmed the ALJ's finding of a violation of Section 8(a)(3) and (1), specifically declined to pass on his finding that Shields' discharge also constituted an independent violation of Section 8(a)(1).

**5.** Also testifying at the hearing was a Salem employee named Michael Gross. Gross had earlier signed an affidavit prepared by Government counsel, which stated that, on the day Shields was fired, Gross had overheard Ellis say to Jay Stoy, the Managing Supervisor at the Hickory facility, that Stoy "should not have hired a un-

ion man." Joint Appendix at 234. At the hearing, however, Gross testified that he had been drunk at the time he had given the affidavit, and thus he didn't remember it. Joint Appendix at 108. Gross called Government counsel prior to the hearing and stated that he didn't want to testify because he was afraid that he would lose his job. Joint Appendix at 116. The ALJ admitted Gross' affidavit as substantive evidence under F.R.Evid. 801(d)(1). Joint Appendix at 161. The NLRB, in affirming the ALJ's finding of a Section 8(a)(3) and (1) violation, stated that it did not rely on Gross' affidavit, apparently wishing to avoid the evidentiary issue regarding its admissibility. Joint Appendix at 174. Since the Board declined to consider Gross' affidavit, we do not rely on the affidavit in affirming the Board's decision.

*Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving this allocation of the burden of proof set out by the NLRB in *Wright Line, a Division of Wright Line, Inc.,* 251 NLRB 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982) ).

The ALJ found that the General Counsel had established a prima facie case of anti-union motivation in Shields' discharge. Joint Appendix at 168–69. The ALJ relied on Michael Gross' affidavit and on the testimony of another Salem employee, Tony Van Horn. Van Horn testified that, in late September 1982, Ellis told several employees that they "ought to be thankful that there wasn't any union organizations [sic] because all these Union places was [sic] going broke...". Joint Appendix at 105. The ALJ also stressed that there was no credible evidence that Shields was an inadequate employee. Shields had successfully completed the 90–day probationary period and had even been assigned additional responsibilities. Thus the firing of Shields shortly after his having made favorable comments about General Electric, a unionized employer, in front of a Salem vice-president suggested to the ALJ that Salem was concerned about the pro-union nature of Shields' remarks. Finally, the ALJ concluded that the testimony of Teague and Ellis regarding "their and Bondurant's nonexplanation to one another of Shields' 'bad' attitude further indicates a suspicious guardedness about the true character of respondent's concern." Joint Appendix at 168.

The ALJ further concluded, and we agree, that Salem has failed to shoulder the burden of demonstrating that Shields would have been fired regardless of his pro-union comments. Having had its arguments regarding poor job performance and economic downturn rejected by the ALJ, Salem now relies on Shields' bad attitude, demonstrated by his comments on the fishing trip, as its justification for firing him. Salem maintains that Shields was discharged for being a disloyal employee who was openly critical of his employer. We are not persuaded by this argument. We find Shields' comments to be less disloyal to Salem than favorable to his former, unionized employer, General Electric, and the wages and benefits he received there. Shields even stated that he liked his job at Salem and indicated that he did not intend to leave that job in the foreseeable future. Moreover, the fact that Ellis initially denied that Shields' fishing trip comments played a role in his discharge suggests that Salem was specifically concerned about the pro-union aspects of those comments, not about Shields' alleged disloyalty.[6]

In affirming the ALJ's finding of an 8(a)(3) and (1) violation, the Board pointed to Shields' good work record, noting that no disciplinary action against him was contemplated until after he made favorable comments about his former, unionized employer. The Board stated that, after Shields' fishing trip remarks, Salem's attitude toward him changed completely and there was a "perceived urgency of the need to get rid of him...." Joint Appendix at 174. In addition to the timing of the dis-

---

**6.** Ellis testified at the administrative hearing as follows:

Q: However, Mr. Ellis, you did not terminate Mr. Shields for any behavior that he had—further comment or conversations in which he had engaged at the fishing trip, is that correct?

A: Not one of the exact reasons, no.

Q: Well, if it was not one of the exact reasons, what was it?

A: I discharged him for the previous reasons. One, his work not at an acceptable level, and his bad attitude was brought up then, yes, and his slowness, and poor housekeeping.

Q: Did Mr. Shields' comments at the fishing trip on which he had gone play at all into your decision to terminate Mr. Shields?

A: No, the comments didn't.

Q: Did any behavior in which Mr. Shields engaged in the fishing trip play into your decision to terminate him?

A: The remarks from Henry Bondurant about his bad attitude and complaining and griping, yes, probably played into it.

Q: What complaining and griping that Mr. Shields had done was it of which Mr. Bondurant spoke to you?

A: I did not speak to Mr. Bondurant on it. Joint Appendix at 14–15.

charge, the Board relied on Van Horn's testimony regarding Ellis' comments on unionized companies going broke and Ellis' comments on Shields' returning to General Electric to indicate Salem's specific concern with the pro-union nature of Shields' comments.[7]

From this evidence, the Board concluded that Salem discharged Shields in violation of 8(a)(3) and (1) because of a fear that he would continue to speak favorably about his union benefits. The issue of anti-union motivation in a discriminatory discharge case is a question of fact to be decided in the first instance by the Board. *Jeffrey Manufacturing Division, Dresser Industries, Inc. v. NLRB*, 654 F.2d 944, 948 (4th Cir.1981). The findings of the Board, if there is substantial support for them on the record as whole, must be upheld even though a reviewing court might have reached a different result had it heard the evidence in the first instance. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–8, 71 S.Ct. 456, 463–64, 95 L.Ed. 456 (1951); *NLRB v. Daniel Construction Co.*, 731 F.2d 191, 193 (4th Cir.1984). Having carefully reviewed the record, we find that there is substantial support for the decision of the NLRB that Salem violated Section 8(a)(3) and (1) in firing Cecil Shields.[8]

The order of the Board is

ENFORCED.

---

**7.** Van Horn testified that Ellis told him the day before Shields' discharge "that Cecil liked G.E., G.E.'s benefits, their pay, and stuff, so good, that he was going to let Mr. Shields go back to G.E." Joint Appendix at 103–04. Shields also testified that, in firing him, Ellis told Shields that he was going to let him go back to General Electric. Joint Appendix at 73.

**8.** At oral argument before this Court, Salem contended that a violation of Section 8(a)(3)

requires that an employee has been engaged in some form of concerted activity. We are not persuaded by this argument. Section 8(a)(3) protects an employee from discrimination based on an intent to discourage or encourage union membership. There is no cross-reference in Section 8(a)(3), as there is in Section 8(a)(1), to Section 7 organizational rights. We are reluctant, therefore, to read a "concerted activity" requirement into Section 8(a)(3).