981 F.2d 76
 142 L.R.R.M. (BNA) 2064, 124 Lab.Cas. P 10,492
 OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION,
AFL-CIO, CLC, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.
 Nos. 392, 512, Dockets 92-4090, 92-4098.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 22, 1992.
Decided Dec. 10, 1992.
 
 Joseph E. Finley, Baltimore, Md. (Lucinda M. Finley, Buffalo, N.Y., of counsel), for petitioner-cross-respondent.
 Vincent J. Falvo, Jr., Atty., N.L.R.B., Washington, D.C. (Charles Donnelly, Supervisory Atty., Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, John Truesdale, Office of Executive Secretary, Marion Griffin, Appellate Court Branch; Rosemary Pye, Office of Director, Region 1, Boston, MA, of counsel), for respondent-cross-petitioner.
 Before: OAKES, NEWMAN and PIERCE, Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 John Connolly was discharged as an international representative by his employer, the Office and Professional Employees International Union ("OPEIU" or the "Union") in November, 1988. The OPEIU seeks review of the finding by the National Labor Relations Board (the "Board") that Connolly's activities in seeking office in a local union, affiliated with the OPEIU, were "protected" and "concerted" activity under the National Labor Relations Act (the "Act"). Office and Professional Employees International Union ("OPEIU"), 1992 WL 90691, 1992 NLRB LEXIS 493 (NLRB April 27, 1992). The Board affirmed a decision by an Administrative Law Judge ("ALJ") that Connolly had been discharged because of this bid for office. The Board found that the OPEIU had violated Sections 8(a)(1) and 8(a)(3) of the Act. The question on appeal is whether running for office in a union which has no actual or potential bargaining relationship with one's employer is protected activity under the Act. We deny enforcement of the Board's order, finding such activity to be completely unrelated to the employer-employee relationship.
 
 I. BACKGROUND
 
 2
 Hired by the OPEIU as an international representative in 1976, Connolly also maintained a membership in Local 6, a local in Boston affiliated with the OPEIU. In his work for the OPEIU, Connolly reported to Mark Reader, the OPEIU's director of organizing. Connolly's responsibilities included participating in organizing campaigns around the country as well as servicing New England local unions without full-time representatives by negotiating contracts and processing grievances and arbitrations. In late 1984, Connolly became the assistant director of organizing and was assigned to organize the professional staffs employed at the University of Massachusetts. The OPEIU lost that bid in May 1986. After another unsuccessful campaign in October, 1986, Connolly resigned his position and returned to being an international representative. The ALJ credited Connolly's testimony that he had resigned voluntarily from this position and had not been demoted. Nonetheless, the ALJ found, and the facts support him, that Connolly's overall job performance for the OPEIU was quite inadequate.
 
 
 3
 In late May, 1988, Connolly announced to James Mahoney, Local 6's business manager and an International vice-president, his intention to run for secretary-treasurer in Local 6. In light of Mahoney's frequent conversations with President Kelly of the OPEIU, the ALJ concluded that Mahoney must have told the president about Connolly's intentions sometime before the October election. According to the ALJ, Kelly's knowledge of Connolly's election efforts explains his decision to send Connolly to Tennessee in the early fall.
 
 
 4
 In late August, 1988, Connolly was assigned by Mark Reader, the director of organizing, to work on an organizing program for OPEIU locals in Tennessee which had agreements with the Tennessee Valley Authority ("TVA"). Connolly felt that this assignment was a direct attempt to undermine his candidacy in Local 6, especially because the timing interfered with nominations which were to be held in early October. Connolly was directed not to return home to Boston every weekend, a direction he felt was also aimed at his candidacy. Connolly testified, and was credited by the ALJ, that he had always come home on weekends when on out-of-town assignments. Although an OPEIU rule existed limiting weekend travel, according to Connolly, it had never been enforced.
 
 
 5
 When Connolly arrived in Tennessee, he talked with Faye Orr, the international representative assigned to the state, to get background on local conditions. During the conversation, Orr informed him that the TVA locals were in contract negotiations and that the employees would not be interested in the organizing program at that time. Because Connolly could not get started with that program, she asked him to take over negotiations between an OPEIU local and a manufacturing company in Chattanooga. Connolly agreed. The ALJ found that the poor timing of the organizing program provided further evidence that Connolly was sent to Tennessee only to divert his attention from the local election in Boston.
 
 
 6
 Despite Reader's order to remain in Tennessee, Connolly went home that weekend, Friday, September 9, and began to prepare papers for his campaign for secretary-treasurer. He did not return to Tennessee the following week allegedly due to an illness. During that week, Reader called him to say that Kelly had changed Connolly's assignment from several months to two two-weekend programs. As a result, Connolly wrote Kelly a letter voicing his suspicions of the change in the assignment: "This confusion or indecision makes me suspicious that local and internal political considerations or even outright discrimination may have been a factor in my being reassigned to TVA et al." On September 27, Reader explained to Connolly that he had been assigned to Tennessee because the complexity of the assignment required a senior staff person. Connolly continued to return to Boston each weekend in defiance of the direction he had received.
 
 
 7
 Connolly was nominated for secretary-treasurer of Local 6 on October 4, 1988. On October 6, 1988, Reader called Connolly to remind him of the policy against weekend travel. Reader told Connolly that if Connolly did not stay in Tennessee that weekend, Kelly might consider his return to Boston as insubordination.
 
 
 8
 Connolly wrote Kelly in protest, stating: "My instincts tell me that your reasons for insisting that I stay in Chattanooga, are motivated by demands from OPEIU Local 6 that I discontinue my campaign to become Secretary-Treasurer of that local in which I am a member." Connolly returned to Boston that weekend as well as the following one. Connolly subsequently received a letter from Kelly, dated October 4, which warned him of the possible difficulties of holding office in Local 6 and serving his employer, the OPEIU, adequately. According to Kelly, "... your duties as International Representative require you to be available to service all our Locals in the United States. Should you be elected to office in a Local Union, the duties of that office and your present duties conceivably will not be compatible."
 
 
 9
 All international representatives received a memorandum from Reader, also dated October 6, informing them that they were not to return home every weekend when on out-of-town assignments. Connolly discussed this memo with Orr and with William Kirby, another international representative. Both called Kelly about the memo whereupon he assured them that their circumstances were different and to ignore it. On October 12, Connolly sent a letter to Reader, complaining about the directive and noting that, according to his calculations, it would actually cost the international more money if he were to stay in Tennessee every weekend. Connolly concluded that "[s]ince there is no apparent savings, it can safely be assumed that your directive is null and void unless political retaliation was President Kellys' [sic] only motive, as I am the only representative immediately effected [sic]."
 
 
 10
 In reply, Kelly wrote Connolly that the memorandum was in fact directed to him. Kelly noted in explanation that "I do not think that it is fair to the people who pay our salaries that you start work on Tuesday and end your work week on Thursday afternoon.... On this assignment, you have taken what should have been done in four days and parlayed it into a 44-day program."
 
 
 11
 Local 6 elections were held on October 25. Connolly was defeated by a huge margin. On October 28, Reader sent Connolly a telegram requesting his appearance at the New York headquarters of the OPEIU on October 31. Connolly arrived in New York on the appointed day. Before the meeting with Kelly, Connolly saw his letter of discharge sitting on a desk and read it. The ensuing meeting was short and ended after Connolly yelled obscenities at Kelly.
 
 
 12
 Connolly filed a charge with the National Labor Relations Board on November 14, 1988, alleging that the OPEIU had violated Sections 8(a)(1)[1] and 8(a)(3)[2] of the Act by discharging him unlawfully. In a decision dated June 18, 1991, the ALJ determined that the OPEIU had in fact broken the law. Although the Union introduced evidence of Connolly's extremely poor job performance, the ALJ found that the OPEIU had fired Connolly for seeking office in his local union and not for his incompetence.[3] Such activity, the ALJ held, constitutes protected, concerted activity, rendering the OPEIU's alleged retaliation an illegal infringement of Connolly's rights under Section 7 of the Act. Moreover, the ALJ concluded that Connolly's protest against the bar on weekend travel also constituted protected, concerted activity. The ALJ ordered the OPEIU to reinstate Connolly to his former position or to offer him a substantially similar position, without prejudice to his seniority or other rights and privileges previously enjoyed. In addition, the ALJ directed the OPEIU to provide backpay with interest. The Board affirmed the ALJ's decision and order on April 27, 1992.
 
 
 13
 The OPEIU appeals on the grounds that it did not fire Connolly for his election activity. Alternatively, the union argues that even if it did fire Connolly for that reason, such activity does not constitute protected, concerted activity under Section 7 of the Act.
 
 II. DISCUSSION
 
 14
 Initially, we will discuss the Board's factual finding that Connolly was dismissed because of his election efforts. We will then proceed to address the Board's legal conclusion that Connolly's actions were protected by the Act as well as its finding that Connolly's protest over the travel order was concerted activity.
 
 A. Factual Findings
 
 15
 The Board's factual findings must be upheld if supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 492-96, 71 S.Ct. 456, 466-69, 95 L.Ed. 456 (1951); Oakes Mach. Corp., 897 F.2d at 89. We see no reason to overturn the Board's finding here that Connolly was fired for seeking elective office in Local 6.
 
 
 16
 The OPEIU argues strenuously that it fired Connolly for reasons totally unrelated to his election activities in Local 6. In support of this argument, it introduced much evidence of Connolly's generally poor work performance and problematic relationships with his superiors. Certainly, the OPEIU could have fired him at any point for his poor work and his insubordination, but the Board found that the true reason for the discharge was Connolly's election activity. The timing of the assignment to Tennessee, the choice of Connolly for the assignment, the directive not to travel on weekends, and Kelly's letter discussing possible problems in Connolly's dual status all suggest that the OPEIU leadership was not happy about Connolly's Local 6 efforts. We cannot say in light of this evidence that the Board's decision is insupportable.B. Legal Findings
 
 
 17
 Congress charged the Board with the duty of interpreting the Act and delineating its scope. NLRB v. Insurance Agents, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). If the Board's construction is reasonably defensible, it must be upheld. NLRB v. Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). Courts have refused to enforce Board orders which had no reasonable basis in law, either because they used an improper legal standard or ignored the plain language of the Act. See, e.g., Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971). More relevant to this case, we will decline to enforce an interpretation which is "fundamentally inconsistent with the structure of the Act" and which usurps "major policy decisions properly made by Congress." American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965).
 
 
 18
 1. Connolly's Discharge for Running for Office in Local 6.
 
 
 19
 The crucial question in this case is whether Connolly's actions are protected by the federal labor laws, and particularly by Section 7 of the Act. Section 7 reads as follows:
 
 
 20
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
 
 
 21
 29 U.S.C. § 157 (1973).
 
 
 22
 Section 7 is "amplified" by the prohibition of certain unfair labor practices, enumerated in Section 8, "which by fair interpretation would constitute infringements upon the substantive rights of employees declared in section 7(a)."[4] Before considering the specific unfair labor practices, therefore, one must first consider whether the actions in question are of the sort that Section 7 was designed to protect. Section 7 serves as the centerpiece of the National Labor Relations Act, establishing basic rights of self-organization and collective bargaining. According to the framers of the Act, providing equality of bargaining power would alleviate industrial strife. 29 U.S.C. § 151. Thus, the Act states that collective bargaining
 
 
 23
 safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.
 
 
 24
 Id.
 
 
 25
 The protection offered by Section 7 has been broadly interpreted by the Board. As one court has noted, "[e]mployees' activities are protected by Section 7 if they might reasonably be expected to affect terms or conditions of employment." Brown & Root, Inc. v. NLRB, 634 F.2d 816, 818 (5th Cir.1981). In Oakes Machine, supra, this Court found employee action which attempted to influence the identity of management hierarchy to be "protected" activity when it "is directly related to the terms and conditions of employment." 897 F.2d at 89. Whether an action is so related is a factual inquiry. In the case of an employee running for office in his or her own bargaining representative, the connection between the activity and the terms and conditions of employment is clear. An employee may not be disciplined by her employer for seeking to participate in the internal affairs of her union. Barton Brands, 298 NLRB 976, 980 (1990) (citing Aces Mechanical Corp., 282 NLRB 928, 930 (1987)).
 
 
 26
 But the Board may not broaden Section 7 to protect activities which have no bearing on the employment relationship. The entire Act revolves around the protection of workers' efforts to better their working conditions through collective action. Nothing in the Act can be understood without keeping this central point in mind. Often, unionization is the goal of such collective action. But the Act does not protect any "union activity" engaged in by an employee if it is unrelated to the terms and conditions of employment. Although this discussion seems obvious, it is clear that the Board ignored this commonsensical approach to the Act in this case. According to the Board, Connolly's decision to run for office in Local 6 was protected by the Act because he "was seeking to become a member of the internal government of Local 6, a position in which he could play a role in collective bargaining and in the representation of Local 6 members." OPEIU, 1992 WL 90691 at *1, 1992 NLRB LEXIS 493 at * 1. The Board fails, however, to go beyond this pat statement to explain what relationship an elective position in Local 6 would have to the terms and conditions of Connolly's own employment. Indeed, the Board admits that Connolly's activities had no relationship to his employment, and in fact were "wholly unrelated to his duties as an employee...." Id. Besides calling Connolly's electioneering "union activity," the Board does not provide a compelling analysis upholding its finding. OPEIU's characterization of Connolly's actions as "personal political activity" hits closer to the mark.
 
 
 27
 Certainly, employees may seek to improve their lot through channels other than the employer-employee relationship. See Eastex, Inc. v. NLRB, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). In such circumstances, however, the employees' actions constitute protected activity because they are attempting concertedly to affect their own employment situation. Thus, in Eastex, the Court found that employees had the right to distribute a newsletter at their workplace, urging political support for legislation protecting workers' rights. Even though the collective action did not involve matters over which their employer had control, their political efforts had a direct bearing on the terms of their employment.
 
 
 28
 Nonetheless, some employee activity remains beyond the scope of the Act. As the Supreme Court stated, "some concerted activity bears a less immediate relationship to employees' interests as employees than other such activity. We may assume that at some point the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause." Id. at 567-668, 98 S.Ct. at 2513. See also NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 833 fn. 10, 104 S.Ct. 1505, 1512 fn. 10, 79 L.Ed.2d 839 (1984) ("... at some point, an individual employee's actions may become so remotely related to the activities of fellow employees that it cannot reasonably be said that the employee is engaged in concerted activity"). We believe this case involves such attenuated employee activity and that it lies outside of the bounds of Section 7's protections.
 
 
 29
 In light of the foregoing discussion, it becomes apparent that the Board has applied a different standard to union-employers than to other employers. Well-established precedent requires that the Act applies to union-employers "just as it would to any other employer." Office Employees International Union, Local No. 11 [Oregon Teamsters] v. NLRB, 353 U.S. 313, 316, 77 S.Ct. 799, 801, 1 L.Ed.2d 846 (1957). Just because an employer is a union, it is not prevented from discharging its employees for activities which are not protected under the Act. See Butchers Union Local 115, 209 NLRB 806, 810-11 (1974) ("In the circumstances of the instant case Respondent must be viewed strictly as an employer of its employees. The fact that in other contexts it is a labor organization has no bearing on its relations with its own employees.")
 
 
 30
 In the ALJ's decision, he relied on cases castigating unions for treating members unfairly to attack the OPEIU's treatment of its employee, thus conflating 8(a)(1) and 8(a)(3) violations with 8(b)(1)(A).[5] OPEIU, 1992 WL 90691 at *89, 1992 NLRB LEXIS 493 at *20-21 These two types of violations, however, are conceptually and legally distinct. Section 8(b)(1)(A) protects union members seeking office within their union from adverse action by the union. This provision serves to protect the democratic rights of dissident union members. Carpenters Local Union No. 22, (Graziano Construction Company), 195 NLRB 1 (1972) (fined a member for dissident activity); Hoisting and Portable Engineers, Local No. 4 (The Carlson Corp.), 189 NLRB 366, enforced, 456 F.2d 242 (1st Cir.1972) (denied a member use of a union-operated nonexclusive hiring hall). In each of those cases, the discriminatory action was directed at the union member in his capacity as a union member.
 
 
 31
 When an employer takes adverse action against employees for their employment-related activities, however, the Board has found that Section 8(b)(1)(A) does not apply. In a case where six union employees were fired for campaigning against incumbent union officers, the Board found no violation of the Act. The Board said,
 
 
 32
 [t]here is no allegation in the instant case, nor does the record establish, that Respondent took any action against the six employees in their capacity as union members, i.e., Respondent did not fine, discipline, or revoke their membership, nor did it deny them rights or privileges available to other union members during the intraunion election campaign. Instead, Respondent's actions were directed against the six only in their capacity as its employees.
 
 
 33
 Retail Clerks Union, Local 770, 208 NLRB 356, 357 (1974). Similarly, in this case, the General Counsel has alleged no 8(b)(1)(A) violation nor shown any actions directed to Connolly as a member of Local 6. Yet the Board found that the Union "discharged Connolly for his activities as a union member, activities wholly unrelated to his duties as an employee...." OPEIU, 1992 WL 90691 at *1, 1992 NLRB LEXIS 493 at * 1. If Local 6 had taken away Connolly's membership, it would have violated the strictures of the Act. It is unclear, however, how the OPEIU affected Connolly's membership in Local 6. As the Board has noted in previous cases, a union is not subject to the strictures of 8(b) when accused as an employer of violating 8(a).
 
 
 34
 "In those cases, where a union fined or adversely affected the job rights and opportunities of employees because of the intraunion activities of those employees, it was acting in its capacity as a union which represented those employees and which therefore owed them the duty of fair representation. The unions were found to have violated Section 8(b)(1)(A) of the Act and not Section 8(a)(1) and (3). There is no concept of duty of fair representation under Section 8(a)(1) and (3) because an employer cannot represent its employees in bargaining with itself."
 
 
 35
 Butchers Union, 209 NLRB at 810 (footnote omitted).
 
 
 36
 Portions of the ALJ's decision highlight his confusion. For example, the ALJ found that
 
 
 37
 Connolly was disciplined not because he ran for office in the International, but because he exercised his right as a member of Local 6 to run for office in that local. The Board has previously found that running for office is a fundamental right protected under Section 7 and the infringement of which is prohibited by 8(a)(1) of the Act.
 
 
 38
 OPEIU, 1992 WL 90691 at *8, 1992 NLRB LEXIS 493 at *20-21 In support of his finding, the ALJ cites cases under both 8(a)(1) and 8(b)(1)(A) of the Act.[6] If Local 6 had been Connolly's bargaining agent, his employer could not have lawfully discharged him for running for office. In that case, the employer would indeed have been guilty of an 8(a)(1) violation. But here, the election activity did not involve the employment relationship. Just because the OPEIU is a union, the Board may not transform an employee's unrelated activity in an affiliated local into protected activity. The Act prevents employers from disciplining employees for activities within their own bargaining agent but does not prevent them from firing workers involved in the bargaining agent for someone else's employees.
 
 
 39
 Running for office in a local union which has no bearing on an employee's terms and conditions of employment is not protected activity under Section 7 of the Act, and, therefore, the Union's decision to fire Connolly is not a violation.
 
 2. Connolly's Protest of the Travel Order
 
 40
 The Board also found Connolly's protest of the ban on weekend travel to be protected, concerted activity under the Act.[7] Unfortunately, the Board leaves unclear whether it determined the protest to be an alternative ground for discharge or merely further evidence that Connolly's electioneering had led to his downfall. In light of the foregoing discussion, we need not address Connolly's election activity again. Thus, we will treat the protest as if it were an independent grounds for dismissal.
 
 
 41
 Unlike Connolly's election activities, his protest over the ban on weekend travel clearly constitutes an activity protected by Section 7. If the Union had discharged Connolly for this protest, it would have violated Sections 8(a)(1) and 8(a)(3). This protest, unlike the electioneering in Local 6, was clearly directed to the terms and conditions of Connolly's employment. See Oakes Mach. Corp., 897 F.2d at 89.
 
 
 42
 Connolly's protest also fulfilled the requirement that a protected action be undertaken in concert with other employees. " 'In general, to find an employee's activity to be 'concerted,' we shall require that it be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself.' " Meyers Industries, 281 NLRB 882, 885 (1986) ("Meyers II ") (quoting Meyers Industries, 268 NLRB 493, 497 (1984) ("Meyers I ")). Connolly discussed the travel directive with two fellow employees. In the course of the conversations, he asked them their opinions on the new policy and informed them about his intention to protest. Both fellow employees contacted the OPEIU about the change in policy. Such joined efforts fall within the statutory definition of concerted activity. As one commentator has noted, Section 7 protects "concerted activities for ... mutual aid or protection" even when the employees' activities are not in furtherance of unionization or union activities. Robert A. Gorman, Basic Text on Labor Law 297 (1976).
 
 
 43
 Nonetheless, the OPEIU did not violate the Act by discharging Connolly. Although his protest was protected, concerted activity, Connolly was not fired for this reason. In cases where two reasons have been alleged for a discharge and only one is unlawful, the Board must apply the reasoning developed in Wright Line, 251 NLRB 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and approved by the Supreme Court in NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under this test, the General Counsel has the initial burden of proving by a preponderance of the evidence that conduct protected by Section 7 of the Act was "a substantial or a motivating factor in the discharge." Id. at 400, 103 S.Ct. at 2473. The burden thereupon shifts to the employer to show by a preponderance of the evidence "that the discharge would have occurred in any event and for valid reasons...." Id. The Board has determined that Connolly was fired for running for office in Local 6.[8] Unless the protest letter was also a major cause of the discharge, the OPEIU's decision to terminate Connolly was not a violation of the Act. We believe that Connolly was discharged for his election activities alone.
 
 III. CONCLUSION
 
 44
 As the Board was incorrect in its determination that Section 7 protected Connolly's efforts to win office in a local union, we deny enforcement of the order it issued in this case.
 
 
 
 [1]
 Section 8(a)(1) provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7 of the Act]." 29 U.S.C. § 158(a)(1) (1973). Generally, this section serves to prohibit employers from firing or otherwise disciplining employees for their involvement in union activities. As this court noted recently,
 [a] violation of § 8(a)(1) is established if (1) the employee's activity was concerted; (2) the employer was aware of its concerted nature; (3) the activity was "protected" by the act; and (4) the discharge or other adverse personnel action was motivated by the protected activity.
 NLRB v. Oakes Mach. Corp., 897 F.2d 84, 88 (2d Cir.1990).
 
 
 [2]
 Section 8(a)(3)
 makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). By its terms, the statute requires proof that disparate treatment has been accorded union members and that the employer's action is likely to discourage participation in union activities.
 Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 700, 103 S.Ct. 1467, 1472, 75 L.Ed.2d 387 (1982).
 
 
 [3]
 The ALJ did note, however, that much of Connolly's actions would have been grounds for termination. "I have no question that Connolly was guilty of much conduct which might have induced any employer to terminate him. Connolly bred problems. But that is not the issue here. The issue is what motivated Respondent to discharge Connolly." OPEIU, 1992 WL 90691 at *10, 1992 NLRB LEXIS at *27
 
 
 [4]
 H.R.Rep. No. 969, 74th Cong., 1st Sess. 15 (1935) (Section 7(a) of the National Industrial Recovery Act was the precursor to the Act's Section 7)
 Although some have argued that Section 8(a)(3), unlike Section 8(a)(1), does not refer to Section 7 and therefore may be interpreted independently of that section, see, e.g., Salem Leasing Corp. v. NLRB, 774 F.2d 85, 89 n. 8 (4th Cir.1985) (Court would not read requirement of concerted activity into 8(a)(3) because of lack of reference to Section 7), this conclusion flies in the face of the legislative history. A violation of 8(a)(3) in fact constitutes a "derivative violation" of Section 8(a)(1) when "the employer's acts served to discourage union membership or activities.... The same proof is therefore required to establish a violation of either section." Ind. & Mich. Elec. Co. v. NLRB, 599 F.2d 227, 229 n. 2 (7th Cir.1979) (citing Inter-Collegiate Press, Graphic Arts Division v. NLRB, 486 F.2d 837, 844 (8th Cir.1973)).
 
 
 [5]
 Section 8(b)(1)(A) makes it an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of rights guaranteed in Section 7
 
 
 [6]
 After noting that Connolly was discharged because "he exercised his right as a member of Local 6 to run for office in that local," OPEIU, 1992 WL 90691 at *8, 1992 NLRB LEXIS 493 at *20-21, the ALJ cited Welfare and Pension Funds, 251 NLRB 1241 n. 2 (1980) (union-employer violated Section 8(a)(1) by discharging employee for activities related to employment conditions); Jacobs Transfer, Inc., 201 NLRB 210 (1973) (employer violated Section 8(a)(1) by firing worker for dissident union activity); and Carpenters Local 22 (Graziano Construction Co.), 195 NLRB 1 (1972) (union violated Section 8(b)(1)(A) by fining and citing union member for his intraunion activities)
 
 
 [7]
 The OPEIU argued vigorously that it was not the protest but the insubordination which caused it to terminate Connolly. In light of the facts, this contention seems reasonable. Nonetheless, we will accept the Board's factual findings on this point as well
 
 
 [8]
 Although the ALJ also asserts that Connolly's protest letter was "a reason for the discharge," OPEIU, 1992 WL 90691 at *13, 1992 NLRB LEXIS 493 at *36, the decision dwells on the OPEIU's concern over its employee's election activities and does not give much weight to this protest