7 F.3d 223
 144 L.R.R.M. (BNA) 2296, 144 L.R.R.M. (BNA) 2744,
127 Lab.Cas. P 11,025
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
HOUSE OF RAEFORD FARMS, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
LOCAL UNION 204, United Food and Commercial Workers, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HOUSE OF RAEFORD FARMS, INCORPORATED, Respondent.
 Nos. 92-2114, 92-2216.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 10, 1993.
Decided: September 20, 1993.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board. (11-CA-12943)
 Order enforced by unpublished per curiam opinion. Judge Wilkinson wrote a dissenting opinion.
 Argued: Charles P. Roberts, III, Haynsworth, Baldwin, Johnson & Greaves, P.A., Greensboro, North Carolina, for Petitioner.
 Joseph A. Oertel, Senior Litigation Attorney, National Labor Relations Board, Washington, D.C., for Respondent.
 On Brief: Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., for Respondent.
 N.L.R.B.
 ORDER ENFORCED.
 Before ERVIN, Chief Judge, and MURNAGHAN and WILKINSON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 A union, the United Food and Commercial Workers Union, Local 204 ("the Union"), and a company, House of Raeford Farms, Inc. ("the Company"), as is not uncommon, waged a struggle over whether the Union, in a properly conducted election, might become the representative of the Company's employees. The Company won the election, and not surprisingly the Union charged numerous violations of the National Labor Relations Act, 29 U.S.C. § 151 et seq. The administrative law judge ("ALJ") found, as to every charge, in favor of the Company. The National Labor Relations Board ("the NLRB") affirmed as to all but three of the charges. As to them, it reversed, deciding in the Union's favor. Violations by the Company of § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1),[1] were found (1) by soliciting, promising to address, and remedying employee grievances during the Union campaign, (2) by permitting only those employees who did not wear "Union Yes" t-shirts to receive a Company-supplied "vote no" t-shirt and by recording the names of employees who accepted "voteno" t-shirts, and, finally, (3) by threatening employees with plant closure if the Union won the election.
 
 
 2
 The Company has contended on appeal that it had legitimate business reasons for soliciting and remedying grievances during the Union campaign and that there was no coercion or intimidation associated with the distribution of the Company-supplied"vote-no" t-shirts. In addition, the Company has contended that the statements of its supervisor were not threats of plant closure but rather were mere expressions of personal opinion. The NLRB has cross-petitioned for enforcement of the order.
 
 
 3
 Our standard of review is one of deference. The NLRB's findings and conclusion that the Company violated § 8(a)(1) must not be disturbed if supported by substantial evidence taken from the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951). "If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first instance." NLRB v. Daniel Constr. Co., 731 F.2d 191, 193 (4th Cir. 1984); see also Universal Camera, 340 U.S. at 488 (noting that "the Board's choice between two fairly conflicting views" should stand even if the court finds that it would have justifiably drawn a different conclusion).[2]
 
 I.
 
 4
 The Company operates a turkey processing plant and employs approximately 1000 people. In the spring of 1988, Marvin Johnson, owner and president of the Company, became concerned about employee dissatisfaction. The annual employee turnover rate stood at the time at roughly 250%, and the Company was plagued by high absenteeism. On May 15, 1988, Johnson hired Eric Wowra to take the position of Personnel Director. Wowra was instructed to explore the reasons for and to suggest solutions to the plant's problems. Johnson specifically expressed to Wowra his concerns regarding the absenteeism, the high rates of turnover, plant safety, the size of work crews, and the high number of employees seeking to borrow money.
 
 
 5
 Almost immediately Wowra began meeting daily with the employees on the plant floor and discussing with them their concerns and perceptions of the plant's problems. Wowra also spoke with a consultant regarding employee retirement plans. A suggestion box also was instituted by the then new General Manager Lou Lucente. On July 19, Wowra, Manager Lucente, and Quality Control Manager Don Brewer conducted an employee meeting at which plant problems were discussed and employee grievances solicited. Attendance was voluntary. According to Wowra's notes, the employees raised complaints about Saturday work, wages, the holiday pay policy, the health excuse policy, vacations, and the bathroom policy. The employees also criticized the behavior of their supervisors: they tore up doctors' notes excusing absences for illness, were insensitive to employee problems, made sexist remarks, and so forth.
 
 
 6
 Sometime in July, Wowra completed "Challenge 1988-1989," a document detailing his suggestions for improving the situation at the plant. The document outlined the basic goals of his proposed program, including reducing plant crewing, improving productivity, reducing processing costs, improving management/supervisory effectiveness, instituting a management/supervisory incentive program, increasing salaries, and improving employee morale. In light of these goals, Wowra suggested that the Company institute a safety program, recognize long-term employees, restart the monthly newspaper, institute a pension plan, increase employee training, upgrade plant appearance, initiate an employee-of-the-month program, study the advisability of a day care program, and hold management picnics.
 
 
 7
 On July 26, Wowra submitted his proposals to Johnson. The two men discussed the topics set forth in the document. When asked by Johnson about the value of continuing the employee meetings, Wowra replied that he was "not real sure about the value of those meetings" and would "get back to him on that." The men also discussed the possibility of a credit union. To that point, the Union had in no way appeared.
 
 
 8
 Two days later, on July 28, four employees walked off their jobs. They complained essentially that they were overworked and underpaid. Wowra told the four employees to take the rest of the day off and to return to work the next morning.
 
 
 9
 The four employees did return the next day. On Monday, August 1, however, several hundred of the Company's 1,000 employees walked out. Questioned by Wowra about their concerns, the employees explained that they wanted a pay raise and improved benefits. They further complained about Saturday work. When Johnson appeared and spoke to the crowd, he announced that he would look into their complaints about Saturday work and other benefits and further declared that all would receive a raise on Labor Day.
 
 
 10
 On the same day, during the walkout, an employee began handing out authorization cards for the National Maritime Union. Wowra noted the distribution of union authorization cards among the crowd. On Tuesday, August 2, the Union (i.e., the United Food and Commercial Workers Union) also began an organizational campaign.[3] At the same time, the majority of striking employees still refused to return to work, and production at the plant was cut significantly. On August 3, Wowra informed the employees that the plant would not operate that Saturday. He further stated that Johnson would stand behind the promises he had made on the first day of the walkout. Ultimately, from Wednesday, August 3, through Friday, August 5, the majority of employees returned to work. Meanwhile, the union organizing continued.
 
 
 11
 The Company returned to full production on August 8. The following day, Johnson, assisted by Wowra, began holding a series of employee meetings "to find out what the problem was." Johnson described the meetings as "strictly for what's bothering you, what can we do to make it better." The meetings were small-ten to fifteen employees attended each session. Over a period of eight days, the company held at least 33 meetings. The Union was not discussed at the meetings; however, during the sessions, Johnson promised to and ultimately did remedy some of the grievances that had been raised during the past several weeks.
 
 
 12
 The Union filed a representation petition on August 15, 1988. The election was held on October 7. The tally showed 420 votes were cast against the Union, and 391 were cast for the Union, with 29 challenged ballots. The Union timely filed objections to conduct affecting the election outcome and also filed unfair labor practice charges against the Company. The objections were consolidated into one complaint.
 
 
 13
 It is evident that only when the Union became involved could the possibility of § 8(a)(1) violations arise from the Company's employee meetings and consideration of grievances. Yet the significant Company attempts to secure employee satisfaction already had begun taking place before the Union entered the picture. See NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988, 999 (4th Cir. 1979) (stating that the promise of benefits during a union campaign is lawful if consistent with company practice or was planned and settled upon prior to the union campaign). The Company's remarks during and following the walkout as well as the 33 meetings with employees-which began before the Union filed its representation petition-simply did no more than finalize what already had been explored and discussed as part of an on-going legitimate business plan to improve conditions at the plant. Furthermore, a Company is not prohibited from reacting to a mass walkout and from taking legitimate steps to prevent future demonstrations. While the evidence shows that meetings occurred and grievances were solicited, the record when viewed as a whole does not suffice to spell out a § 8(a)(1) violation.
 
 II.
 
 14
 During the Union organizing campaign, supply room clerk Beatrice McCrae was given by the Company 1,000 "vote-no" t-shirts to distribute to employees. McCrae routinely required employees to sign a list when they removed supplies from the supply room, and she continued that practice when she distributed the t-shirts. There is no evidence in the record that McCrae was told by management to deviate from her usual routine. In addition, McCrae also denied t-shirts to employees who were wearing pro-Union clothes. In response, several employees complained to a Company supervisor. Unaware of McCrae's decision to limit distribution in such a manner, Johnson was informed by the supervisor of McCrae's method. However, he allowed McCrae to continue refusing t-shirts to those employees wearing prounion attire and commented that the employees had "to be one way or the other."
 
 
 15
 The question on appeal is the correct inference as to whether the Company's manner of issuing t-shirts amounted to as 8(a)(1) violation. The NLRB, possessed of large discretion, was justified in deciding that the evidence supported a finding that the Company's "method of distribution" of the "vote no" t-shirts tended to interfere with the employees' free choice during an election.
 
 
 16
 The distribution by an employer of antiunion material does not violate the Act unless it is accompanied by some form of coercion or pressure. The NLRB has ruled, for example, that directly asking an employee during a Union election to wear some article expressing antiunion sentiment constitutes a form of interrogation because, under those circumstances, the employee is forced into an open declaration either for or against the Union. See, e.g., Lott's Elec. Co., 293 NLRB 297 (1989), enf'd., 891 F.2d 281 (3d Cir. 1989) (supervisor handed out "vote no" buttons, and such conduct constituted interrogation because it forced the employees into an open declaration either for or against the Union).
 
 
 17
 The Company here did no such asking. However, the NLRB has further held that if an employer records the names of employees in a context in which it could gain an understanding of the employee's knowledge of or sympathies for pro or antiunion activities, the employer has violated the Act. Under those circumstances, the employer's conduct interferes with an employee's exercise of his or her rights because the recording of the names provides the company with the opportunity to discern the leanings of its employees and to direct its energies toward or to pressure particular employees during a campaign. See, e.g., Houston Chronicle Publishing Co., 293 NLRB 332 (1989) (recording names in an employer-sponsored raffle); National Gypsum Co., 280 NLRB 1003 (1986) (employees required to identify themselves on entry forms for an employer-sponsored raffle).
 
 
 18
 There is no question that the Company clearly could distribute "vote no" t-shirts to gain support for its side during the Union campaign and to "combat" the "vote yes" t-shirts. The question, however, is whether its chosen method of distribution-including the refusal to provide t-shirts to those employees wearing prounion attire and the requirement of signing McCrae's list upon receipt of a t-shirt-amounted to conduct that reasonably could be coercive or infringing to employees. "In evaluating an employer's conduct under section 8(a)(1), 'the test is not whether the language or acts were coercive in actual fact, but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate.' " NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 965 (4th Cir. 1985) (emphasis added) (quoting Corrie Corp. v. NLRB, 375 F.2d 149, 153 (4th Cir. 1967)).
 
 
 19
 In light of the circumstances in the instant case, the conclusion of the NLRB that the method of t-shirt distribution had a reasonable tendency to intimidate or coerce is a reasonable one. As noted, supply room clerk McCrae refused, on her own accord, to give the t-shirt to any employee wearing prounion attire. As a consequence, prounion employees became more identifiable. Furthermore, the employees were in fact bothered by the distribution, for they complained to a supervisor about McCrae's practice of selectively dispensing t-shirts. When informed of McCrae's decision, the Company did not abrogate the practice but instead commented with approval. McCrae also required-as she did for all supplies taken from her supply room-the employees to sign her supply room list acknowledging receipt of the "vote no" t-shirt. Possible identification of prounion employees was therefore increased. In short, the t-shirts were not distributed in a readily apparent free and random manner. As the NLRB commented, by distributing the t-shirts and taking down names, McCrae was "cloaked in the apparent authority of the Respondent as its special agent, much as employees who solicit authorization cards are deemed special agents of the Union."
 
 
 20
 Under the circumstances, the method of distribution reasonably could have been coercive and infringing to employees, and the NLRB's finding of unlawful conduct must be sustained.
 
 III.
 
 21
 Finally, the day before the election, Annie Gilchrist, a supervisor in the cutup and packing department, talked about the Union with approximately eight to ten different employees. The ALJ and the NLRB both credited Gilchrist's testimony that she said in each conversation: "I'm not asking you how you plan to vote. I need my job and if the Union come, we both might be out of a job." The one-on-one conversations apparently lasted approximately one minute, and there was no evidence that the employees communicated Gilchrist's comments to any other employees.
 
 
 22
 "It is well established that an employer violates section 8(a)(1) of the Act if it threatens to close the plant or institute layoffs if its employees select union representation." Nueva, 761 F.2d at 966. Section 8(c), 29 U.S.C. § 158(c), however, makes it clear that the expression of an opinion does not constitute an unfair labor practice if the expression contains "no threat of reprisal or force or promise of benefit."
 
 
 23
 Accordingly, Gilchrist's statements, as statements of a Company supervisor, presented two alternative choices, and the NLRB did not fail to make a supportable choice. The question is whether the statements had a "reasonable tendency" under the circumstances to intimidate. Gilchrist did not explicitly state that she was giving her personal opinion or voicing her own fears. Rather, the day before the election, she relayed only the statement that "she was not asking how you plan to vote" but "we might both be out of a job " if the Union won the election. Clearly, the remarks conveyed the specter of layoffs in the event of a Union win. Moreover, Gilchrist did not"soften" the notion of job losses by any mention that she was giving merely her personal opinion. Although the conversations did not occur in an intimidating office setting, they did nevertheless take place during work hours in the work area, not, for example, in a social setting or during a lunch break. In short, it is not patently clear that Gilchrist was conveying merely her personal opinion. It seems an equally reasonable and fair conclusion of the NLRB that employees, often intimidated by or even respectful of supervisors, could interpret Gilchrist's remarks as the comments of a Company official, as opposed to the opinion of a concerned coworker. Cf. NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969) (noting that an inquiry into the effect of employer statements must "take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear").
 
 
 24
 Gilchrist's statements, made not to one, or two, but to numerous employees, near the culmination of a hotly contested election could have proceeded from a purely private personal opinion, but the NLRB was not precluded from ascribing the remarks to the Company. As the French say: "I'm not asking" could be a case of "qui s'excuse, s'accuse." Gilchrist was a departmental supervisor and thus could be allied with management. Under the circumstances, the finding of a § 8(a)(1) violation was properly within the powers of the NLRB.
 
 
 25
 In summary, of the three § 8(a)(1) violations determined by the NLRB to have existed, one (soliciting and remedying grievances following a walk-out but during a union campaign) we find to be unjustified. However, the other two (the "vote-no" t-shirt distribution and supervisor Gilchrist's statements expressing uneasiness about plant closure if the Union won the election) we conclude were within the authority of the NLRB to be decided as they were. Consequently, we order that the order of the NLRB with respect to the latter two claimed § 8(a)(1) violations be enforced.
 
 ORDER ENFORCED
 WILKINSON, Circuit Judge, dissenting:
 
 26
 I cannot join the majority's enforcement of the Board's order in this case. The first ground asserted by the NLRB effectively punishes the House of Raeford for nothing more than trying to keep its business afloat in the face of a massive employee walkout. The additional grounds offered by the Board in support of its decision appear almost in the nature of an afterthought-indeed, the Board appears to concede as much with respect to the third asserted basis for enforcement. The ALJ rejected both these grounds for finding ans 8(a)(1) violation, and I believe them to be without substantial evidence.
 
 
 27
 I commend the majority for not enforcing the order on the basis of the Board's first finding that Raeford's remedying of employee grievances during the course of an election campaign was an unfair labor practice. Raeford had experienced a massive employee walkout, a situation that makes turkey processing very difficult. Management knew that it had labor problems even before this walkout, as evidenced by Marvin Johnson's hiring of Eric Wowra as personnel director and Wowra's meetings with employees in an effort to trace the sources of their dissatisfaction. The walkout confirmed for Johnson and Wowra that they must address those problems or risk another walkout that could do in Raeford's business.
 
 
 28
 To be sure, an employer cannot improve working conditions if the timing is calculated to discourage union activity or restrict employees' choices. J.P. Stevens & Co. v. NLRB, 668 F.2d 767, 770 (4th Cir.), vacated on other grounds, 458 U.S. 1118 (1982). On this record, however, the Board has not shown that Raeford conferred benefits on its employees with the primary "purpose of inducing employees to vote against the union." NLRB v. Exchange Parts Co., 375 U.S. 405, 409 (1964). The Board asserts that it may presume that the benefits were offered to sabotage the union, but any such presumption has surely been rebutted here. Raeford was responding to the walkout's significant disruption of its business, just as the union responded to the walkout by initiating an organization campaign. As the ALJ found, the walkout "was certainly a graphic illustration that the employees were dissatisfied and had problems. [Raeford] was more than justified in finding out what those problems were and curing them." To handcuff Raeford from addressing its employee relations problems in these circumstances would transform the labor laws into a suicide pact; if Raeford loses all its employees and is forced to shut down, there will be little union organizing to do. The Board's decision puts the cart before the horse-instead of seeing the labor laws as a means of securing good employer-employee relations, it bars the company from improving employee relations because such a course may impede unionization. This makes little sense to me.
 
 
 29
 The second basis for the Board's finding of an § 8(a)(1) violation-Raeford's distribution of "vote no" t-shirts-is equally puzzling. It is well established that an employer's distribution of antiunion material is unlawful only if the employer coerces employees into receiving such material. See, e.g., William T. Burnett & Co., Inc., 273 NLRB 1084, 1093 (1984). In making the requisite"coercion" finding, the Board is unable to point to any evidence that the employees were coerced by the employer's t-shirt offer. As the record makes clear, the employees were free to request t-shirts or not, and management did not attempt to force the shirts upon any employee. Faced with this lack of evidence of coercion, the Board instead asserts that it is entitled to presume coercion from (1) supply room clerk Beatrice McCrae's keeping of a list of those who requested and received t-shirts, and (2) McCrae's refusal to give t-shirts to those wearing prounion paraphernalia.
 
 
 30
 This goes too far. Ms. McCrae's keeping of the list hardly qualifies as coercion because the list-keeping was a standard practice used to keep track of inventory in the supply room. The ALJ found, and the Board does not dispute, that Ms. McCrae kept lists for all supplies, and that the employees knew about her record keeping practice.
 
 
 31
 Given the ALJ's findings that "[m]anagement gave her no instructions to keep such a list" and that "[t]here is no evidence that management was even aware of the list[,]" it is unreasonable to assume that Raeford used the list for polling, rather than inventory, purposes.
 
 
 32
 Ms. McCrae's decision not to give t-shirts to employees wearing pro-union shirts is also an insubstantial basis for a finding of coercion. The majority finds this "selective[ ] dispensing" of t-shirts to be objectionable because it caused "prounion employees [to become] more identifiable." Majority Op. at 12. However, as the ALJ noted, "[t]he employees with pro-union shirts were literally showing their sentiments on their chest" and had already publicly declared their position. It is unreasonable to assume that Ms. McCrae's practice would somehow influence the employees' decisions regarding the t-shirts and, ultimately, the election.
 
 
 33
 Finally, the Board supports its third finding with illogical presumptions rather than with substantial evidence. The Board asserts that Ms. Gilchrist's statement-"I need my job and if the Union come, we both might be out of a job"-constituted an unlawful threat to close the plan or to institute layoffs. This finding is flatly contrary to the Board's earlier decision in Standard Products Co., Rocky Mount Div., 281 NLRB 141 (1986), modified on other grounds, 824 F.2d 291 (4th Cir. 1987). In Standard Products, the Board upheld as lawful strikingly similar statements made by a supervisor to an employee. The Board seeks to justify its inconsistent treatment of the two cases by emphasizing that the supervisor in Standard Products explicitly stated that it was "her personal opinion " that "if the Union came in, the plant would close down, and she needed her job." 281 NLRB at 151. Because Ms. Gilchrist failed to utter the magic words, "this is my personal opinion," the Board assumes that she was speaking in her capacity as a supervisor.
 
 
 34
 This assumption goes against both the evidentiary record and common sense. She spoke of her fear that "we both might be out of a job," thereby indicating that she spoke as a fellow employee rather than as a company supervisor. In addition, she made clear that her concern stemmed from her personal need for employment, not from her professional concern for the welfare of the company. In the words of the ALJ, "I have no doubt that Gilchrist was expressing her personal opinion."
 
 
 35
 In sum, the Board's findings were based on flawed presumptions rather than substantial evidence. The majority has allowed deference to Board findings to gut the requirement that the Board provide substantial evidence on the record as a whole. To the extent the Board's order rests upon findings that this company violated the National Labor Relations Act, I would deny its enforcement.
 
 
 
 [1]
 Section 8(a)(1) protects employees by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights, under § 7 of the Act, 29 U.S.C. § 157, to organize, join, form, or assist labor organizations
 
 
 [2]
 The only dispute in the instant appeal concerns the proper inference (i.e., lawful conduct or unlawful conduct) to be drawn from the evidence. The parties, for example, do not appear to dispute issues of material fact. Furthermore, the NLRB did not overturn the ALJ's credibility determinations. The NLRB, however, did draw different conclusions from the ALJ's findings of underlying fact. Therefore we are not placed in the position of evaluating the ability of the NLRB versus the ability of the ALJ to judge the veracity of various witnesses and to make findings of fact. In short, the NLRB is not precluded from drawing inferences or legal conclusions that are contrary to those of the ALJ. Accordingly, the substantial evidence standard of review should remain the same for the purposes of the appeal. See, e.g., American Thread Co. v. NLRB, 631 F.2d 316, 320 (4th Cir. 1980) ("[The] standard of review is not altered because the Board drew different inferences and legal conclusions from the evidence than did the ALJ.... The Board, not the ALJ, is ultimately vested with the responsibility for determining whether an unfair labor practice has been committed."); see also NLRB v. Frigid Storage, Inc., 934 F.2d 506, 509 (4th Cir. 1991) (stating the same and noting that "there is an important distinction between an ALJ's findings as to credibility of witnesses and those drawing inferences or applying applicable law.")
 
 
 [3]
 The National Maritime Union eventually withdrew from the campaign